<hr />

LYMAN BOWEN *v.* LEMUEL KING, *apt.*

*School Districts. Taxes. Evidence. Presumption.*

A school district can raise money for building a school house or supporting a school only by vote of the district in a meeting legally warned. The prudential committee are only authorized by statute, to assess a tax on the list

Bowen *v.* King.

of the district " after the vote of the district for that purpose." Nor does the act of 1850 (Comp. Stat., Ch. 20, sec. 44, p. 149,) requiring districts to raise teachers' wages upon the grand list, authorize the prudential committee to assess a tax therefor without a vote of the district.

Although no statute existed in this state prior to the year 1808, by which inhabitants of different towns could be united in one school district by action of such towns, and therefore no presumption of law could be raised, in the absence of record evidence of the organization of such district, that it had been created prior to that year, by the action of such towns; yet such a district might, previous to that year, have been constituted by special act of the Legislature; and where such district had been in continued existence f. r more than twenty-five years prior to 1808, with the continued acquiescence of the towns out of which it was erected, as well as of the inhabitants of the district itself; *held,* that the original creation of the district by act of the Legislature might well be presumed.

And where portions of three towns had acted together as a union district for more than fifteen years subsequently to the act of 1808, (Slade's Statutes, 593, No. 2,) authorizing towns to form such districts, before any action was taken by the district or by the towns out of which it was formed, implying any doubt as to the perfect legality of the district, *held,* that this was sufficient to raise the presumption, in the absence of evidence as to the formation of the district, that it was legally created and organized by action of the constituent towns.

When a union district of this kind had existed more than fifteen years subsequently to the act of 1808, the district and one of its constituent towns, in which was the district school house, voted to accept into the district those portions of two other towns which had previously acted with, and been considered parts of the district; *held,* that this action could not be regarded as any evidence that the legal existence of the district was not already perfect, but was probably the result of over-caution, as there was no record evidence of the formation of the district; that although insufficient in itself to create a legal union district, it could not operate to destroy one already existing.

When such union district is once legally formed, it can only be dissolved by application to the county court under the statutes, (Comp. Stat. ch. 20, sec. 47, p. 150); neither of the towns out of which it is created can destroy it.

And *quere,* whether such districts are not entirely exempt from all control of the towns to alter their limits in any manner.

But where by vote of one of the towns a quantity of land in that town, owned by a person residing in another of the towns composing the district, was set off to the district; if the towns and the district for any considerable time assented to and acquiesced in this alteration, all parties would be bound by it.

And if otherwise, the action of the town setting off the land to the district would be merely nugatory, and the land would become no part of the district.

A union district was composed of parts of three different towns, *Held,* that the relation to each other of these parts could not be such as is provided for by sec. 21, ch. 20, Comp. Stat., whereby a town may set one or more of its inhabitants to a district in an adjoining town, with the consent of such district; because the parts of the disirict embraced in two of the towns did not appear ever to have had, or claimed to have, any organization as districts themselves, so that persons of the third town could have been set to them under this statute; and on the other hand, the first mentioned two towns did not appear ever to have voted to set any of their inhabitants to the district in the third town, except a vote in one of those towns in 1851, after the union district had actually existed more than seventy years.

*Held* further, therefore, that the district in question being a union district composed of parts of different towns, one of these parts could not by its own action, or that of its town, dissolve the district, or act as a district by itself so as to elect legal officers or impose legal taxes.

The case was referred and the referee reported the following facts :

School district No. 1, in the town of Sunderland, and the persons owning or residing upon certain farms in the town of Manchester and one farm in the town of Sandgate, have all acted together and supported a school as one district, since about the year 1783. No records were kept in the district until the year 1805 ; since that time the district officers have been chosen in part from Manchester and Sandgate. The Manchester part of the district has been known as the Brownson district, but never had any organization except with Sunderland, and never chose officers or had a school house or school by themselves.

In 1829, sixty-six acres of land, which had been purchased in Manchester by a person then living in Sunderland, were added to the Brownson district by a vote of the town of Manchester.

There is no record of any action on the part of Sunderland, Manchester and Sandgate, creating a union district, except as hereafter stated. The district was organized at a meeting called by the selectmen of Sunderland on the 6th of November, 1805. There is no evidence of any prior organization. At the first annual meeting of the district after this organization, holden November 25th, 1806, a resident of Manchester was chosen mod-

erator, and other Manchester men participated in the meeting; and the officers of the district have been elected from year to year since that time without reference to whether they resided in the Manchester, Sunderland or Sandgate part of the district. There has been a school house in the Sunderland part of the the district for more than seventy years.

On the 30th of December, 1827, the district voted to accept into it the inhabitants in that part of Manchester, commonly called the Brownson district, and also the person then living on the farm in Sandgate before referred to.

At a town meeting holden in Sunderland, March 17th, 1828, it was voted that so many residents of the town of Manchester as are desirous to be proprietors in school district No. 1, in Sunderland, should be annexed to that district, also the family residing on the farm in Sandgate above mentioned.

At a town meeting holden at Sandgate, March 4, 1851, the person then residing on said farm in that town was set off from district No. 5 in that town to a school district in Sunderland.

The Brownson district received its proportion of the public money in Manchester, which was distributed *per capita*, and the same was appropriated for the support of the school kept in the school house in Sunderland. Before 1827 the money was paid to a trustee, after that time to the clerk of district No. 1, in Sunderland. The first time it was paid to them properly as to a fractional district, was in 1844.

In 1856 the district in question built a new school house on the site of the old one, and two Manchester men with one Sunderland man were by a vote of the district, appointed a building committee. The district voted to accept the new school house, and raised a tax to pay for it in October, 1857. Those residing in Manchester attended and voted at this meeting. The majority of those residing in Sunderland voted against accepting the house and against the tax. A school has been kept in the new school house every season since it was accepted, to this time, and one winter it was occupied by the whole district. The men living in Manchester and Sandgate and a part of those living in Sunderland, have kept up the district organization by holding school meetings and electing officers,

At a town meeting holden in Sunderland, March 2d, 1858, it was voted to exclude Manchester and Sandgate from district No. 1. At a school district meeting holden at the school house in district No. 1, in Sunderland, March 20th, 1858, for this, among other things, to vote to exclude all persons residing in Manchester and Sandgate from participating in the benefits of such district, it was voted to adjourn the meeting to the 2d Tuesday of September following. Those living in the Manchester part of the district attended and voted at this meeting, to which a majority of those residing in the Sunderland portion of the district objected, and voted against the adjournment.

March 29th, 1858, a school district meeting was warned to meet at the shop of one King in the Sunderland part of the district on the 5th day of April 1858, for the purpose, among other things, of voting to exclude certain persons residing in Manchester and Sandgate from the district ; and at that meeting it was voted to exclude all such persons from the district. Those opposed to the object of this meeting only attended it for the purpose of objecting to its proceedings. At the adjourned meeting holden at the school house on the second Tuesday of September, 1858, it was voted to adjourn without day.

The defendant in this case, at the time of taking the property described in the plaintiff's declaration, was collector of school district No. 1, in Sunderland, having been elected, with the other officers of the district, March 29th, 1859. The property in question was taken by him by virtue of a tax bill certified by the prudential committee of district No. 1, in Sunderland, elected October 27th, 1858, and a warrant issued thereon, dated April 13th, 1859, by a justice of the peace in Sunderland, to satisfy a tax assessed against the plaintiff. The tax was made up on the grand list of 1858, and was in part for the teacher's wages ; and those persons only were included who had been designated by the listers of Sunderland as residing in district No. 1. Those living in Manchester and Sandgate were not assessed in the tax and rate bill upon which the property in question was taken and sold by the defendant. There was no vote of the district assessing or ordering the tax in question.

Since the vote at the meeting held at King's shop, above men-

tioned, to exclude those living in Manchester and Sandgate from the district, a majority of the legal voters, residing in the Sunderland part of the district, have kept up a school district organiza- tion by holding school meetings and electing officers, and it was by the latter that the defendant was elected collector, and through their officers that the tax in question was assessed.

If from the foregoing facts the court shall be of the opinion that the plaintiff should recover, the referee found that he should recover the sum of one dollar and fifty cents and his costs ; otherwise, that the defendant should recover his costs.

Copies of certain records accompanying the report were referred to by the referee, but under the decision it is unnecessary to set them forth.

The county court, rendered judgment, upon the foregoing report, for the plaintiff; to which the defendant excepted.

*H. Canfield*, for the defendant.

*A. L. Miner* and *H. E. Miner*, for the plaintiff.

POLAND, CH. J.   The proceedings under which the defendant seeks to justify taking the plaintiff's property are fatally defective, for the reason that the tax was never voted by the district.   The statutes authorizing school districts to raise taxes for building school houses, and supporting schools, require them to be raised by vote in a meeting legally warned, and no other mode is provided ; and the prudential committee are only authorized to assess a tax on the list of the district " *after the vote of the district for that purpose.*"   This has always been understood to be a necessary requisite to a legal tax, and many cases are to be found in our reports where the form and sufficiency of the proceedings of the district in voting the tax have been considered and determined.   *Brown* v. *Hoadley*, 12 Vt. 472 ; *Chandler* v. *Bradish*, 23 Vt. 416.   Nor does the act of 1850, requiring districts to raise *teacher's wages* upon the grand list, authorize the committee to assess a tax therefor, without a vote of the district. The language of the act clearly contemplates a vote.   " *All monies raised by school districts,*" etc.   Districts can raise money

12

only by vote.  There seems no more reason for allowing a com-
mittee to assess a tax in such case without a vote, than in any
other case, where there is a legal liability upon the district,
which must eventually be satisfied by a tax upon the inhabit-
ants of the district.

This point would be decisive of the present action, but another
and more important question is presented by the case, and as the
counsel have fully discussed, and the court considered it, we
deem it proper to give our judgment upon it.

This tax was assessed only upon the inhabitants living in a
particular territory, or district, wholly in Sunderland ; and the
defendant was appointed collector by a vote of the persons resid-
ing within that territory, treating that as a legal and separate
school district, lying wholly in that town.  The plaintiff claims
that this territory was not a legal school district of Sunderland,
but that it, together with contiguous territory in Manchester and
Sandgate, constituted a legal union school district, which had
never been legally dissolved.

The great question is, whether the facts reported by the referee
are sufficient to show the existence of a union district, for if
one ever did exist, it is clear that it has not been legally dis-
solved, for all the action for that purpose was on the part of the
town of Sunderland, and of that part of the district lying in
Sunderland, which would clearly be nugatory to produce any
such result.

The referee reports, that the inhabitants of this territory or
district in Sunderland, and the inhabitants living in certain con-
tiguous territory in Manchester and Sandgate, have all acted
together, and supported a school as one district for more than
seventy years, and that since 1805, (the time when said district
appears to have commenced keeping records,) the officers of the
district have been selected from each of the three towns, thus
acting in the district.

The records referred to by the referee in his report, do not
show the formation of a union district by any sufficient action of
the towns from which it was constituted, nor is this claimed on
the part of the plaintiff.

What is claimed by the plaintiff is, that from the long period

that the inhabitants of this territory acted together, in the character and capacity of a union school district, exercising all the rights and privileges, and performing the duties thereof, with the acquiescence of the respective towns, the legal erection of such territory into a district, and its proper organization, is to be presumed ; but that after so great a lapse of time, it cannot now be shown.

It has been settled by repeated decisions in this state, beginning with *Barnes* v. *Barnes*, 6 Vt. 393, and coming down to *Bull* v. *Griffith*, 30 Vt. 273, that the legal existence and organization of ordinary school districts will be presumed after a long continued maintainance of such organization, and exercise of the functions of such district ; although the records of both town and district, wholly fail to show its creation or organization. The defendant claims that the doctrine of these cases cannot be applied to the present ; that prior to 1808, no presumption can be made in favor of the legal existence of a union school district, because no power or law then existed, by which one could in any manner be created. If this claim is well founded in fact, it is certainly a full answer to any presumption in favor of such district prior to that time. It would be like claiming a presumption of a deed, or grant, from long occupation, when no person existed who could make a deed or grant. But is it true no such power existed ? No statute by which the towns could create a union district existed in this state until 1808, and therefore no presumption can be made that it was done by action of the towns. But it is insisted by the plaintiff that such a district might have been constituted by a special act of the legislature, and that such an act should be presumed.

In *Pierce* v. *Whitman*, 23 Vt. 626, it appears, that such a district was created by a special act, in the towns of Hartford and Pomfret, and the legal power of the legislature to pass such an act is not questioned by court or counsel. We are unable to see any good ground of objection to such creation of a mere municipal corporation by the legislature, where no general law existed by which the towns were empowered to create them. We understand the doctrine of presumption as applied to school districts, to be founded upon the same general principles and policy, as the

presumption in favor of grants, deeds, etc., the great improbability that a state of things entirely inconsistent with the present existence of such an instrument, should be allowed to continue, and be quietly acquiesced in for a long period of time.   In favor of long continued user and possession, courts have said they would presume everything. Acts of parliament, grants from the crown, surrenders of charters, and many other things, have been presumed.   This district appears to have been in continued existence and action, for more than twenty-five years before 1808, and we may well presume that it was formed by an act of the legislature. The continued acquiescence of not only the inhabitants of the district, but of all the three towns, cannot be otherwise rationally accounted for.   But even if it were necessary that the presumption should be made after the act of 1808, authorizing towns to form union districts, there seems ample room to sustain it.   There does not appear to have been any action by the district, or by either of the towns, implying any doubt as to the perfect legality of the district until 1827, or 1828, when the district, and the town of Sunderland, voted to accept into the district, that part of Manchester and Sandgate which had previously acted with, and been considered a part of, the district.   This action of the district and the town, we cannot regard as any particular evidence that the legal existence of the district was not already perfect, but as no record evidence of it existed, this probably was, from over caution, regarded as a measure of safety ; and though insufficient of itself to make a legal union district, it could not operate to destroy one already existing.   It has never been suggested that a longer period than fifteen years continued action as a district was necessary, to raise the legal presumption in its favor, in accordance with the general rule of prescription in this country ; and much more than that period had elapsed after 1808, before this attempted action of the town and district.

The report shows that in 1829, sixty-six acres of land in Manchester, owned by a man in Sunderland, was set to this district by vote of the town of Manchester.   It is urged that this shows, that this could not have then been regarded as a union district, because if so, neither town alone, could alter its limits, by adding to, or taking from, its territory.

It has always been understood to be clear, that when a union district was once legally formed, neither town could destroy it ; that such district could only be dissolved, in the manner provided by the statute, by application to the county court.

But it has been a vexed question, whether such districts were entirely exempt from all control of the towns, to alter their limits merely, as convenience might require.

In *Pierce* v. *Whitman*, cited above, REDFIELD, J., intimates his own opinion, that the towns might thus alter the lines of the district, though they had no power to dissolve it. In seems difficult, however, on any principle, to see how the town could interfere at all, unless they had full power over the whole, within the town. This question has been before the court on several occasions within a few years, but I am not aware that it has ever been distinctly settled.

However this might be, if territory was thus added, and the town, and the district for any considerable time, assented to the alteration, and acquiesced in it, all parties would be bound by it. This is decided by the case of *Pierce* v. *Whitman*. At the very worst, however, this action of Manchester would be merely nugatory, and the sixty-six acres would not become part of the district. It is also insisted by the defendant, that if there is enough in the case to show any legal connection at all as a district, between these fragments of different towns, it was not a proper union district, but only such a case as is provided for by the 21st sec. of chap. 20, where a town may set one or more persons to a district in an adjoining town, with the consent of such district. But from the records in the case, it does not appear that any such relation as this was ever legally contracted. The Manchester and Sandgate parts of the district, do not appear to have ever had, or claimed to have, organization as districts, so that the Sunderland part could be set to them, under the statutes. It must have been formed then, by setting the Manchester and Sandgate parts to the district in Sunderland. But there does not appear to have ever been any vote on the subject by the town of Manchester at all, and none in Sandgate till 1851, when the district had actually existed nearly seventy years.

The case then is left to stand upon the proper presumption to

be raised from this long period of connected and harmonious action together, as a school district, and we are all of opinion, that it points to a fixed and permanent union district, indissoluble except in the mode pointed out by statute, rather than to the mere temporary arrangement provided for by the 21st sec., which either party may dissolve at pleasure. This being so, one part of the district could not by its own action, or that of the town. dissolve it, and the action of a mere fraction, claiming to be a district, was illegal and void ; they could not elect legal officers, or impose legal taxes.

The judgment is affirmed.