## THE TOWN OF BENNINGTON *v.* PARK AND OTHERS.

## [IN CHANCERY.]

### *Constitutionality of Aid to Railroads. Estoppel. Equity.*

As the state Legislature has all the law-making power of the people not expressly reserved by the Constitution, its acts are to be presumed constitutional, and are not to be held otherwise, except upon clear and irrefragable evidence that they are in conflict with some provision of the Constitution.

The Legislature of the state passed an act authorizing certain towns to subscribe for, purchase, or acquire, on specified conditions, bonds of a certain railroad company in New York, or the bonds or stock of any railroad company whose road should so connect with certain railroads in this state that ran through and near said towns as to afford communication with New York or Boston, and to make and issue their own negotiable bonds for that purpose ; and providing that no such subscription should be made, "unless the assent in writing thereto of a majority of the tax-payers, both in number and amount of tax," signed and acknowledged before a justice of the peace "by each person so assenting," should first be had upon an instrument of assent naming three resident citizens and tax-payers to be commissioners to make said subscription, nor unless said commissioners should also first append to such instrument their certificate that such majority had duly assented, and procure such instrument and certificate to be lodged and recorded in the town clerk's office, and a copy thereof, certified by the town clerk, to be recorded in the county clerk's office. *Held,* not unconstitutional for authorizing taxation for other than a public purpose—because the purpose was public : nor because the aid thereby authorized inured to the benefit of a private corporation ; for the right to tax depended upon the public character of the object to which the fund was appropriated, and not upon that of the means selected to apply it : nor because the enterprise the towns were thereby empowered to aid was beyond the scope of the purposes for which towns are organized ; for towns are created to perform such governmental functions as the state may for convenience devolve upon them : nor because, the work being of a public character, the general public should have been taxed in its aid ; for, if the local public enjoy peculiar advantages thereby, the taxes may be apportioned : nor because the power was not given to be exercised only by consent of the towns, expressed by vote in open town meeting ; for the town's consent, although not needed, was in fact procured by a vote more effectually guarded than the one contended for could have been : nor because the rail-

road to be aided was without the state ; for if the road aided was useful to the public, there was warrant for the exercise of the power of taxation in aid of it, whether it was within the control of the state or not.

Towns in existence when the Constitution was formed, have no reserved sovereignty not enjoyed by all other towns in the state.

One of said towns, acting ostensibly under said act, subscribed for certain railroad stock and bonds, and procured its own bonds to be issued and delivered to said railroad company in exchange therefor. For several years thereafter the town, at its annual March meetings, treated its bonds so issued as a valid indebtedness, and the railroad bonds as available assets ; and finally, pursuant to vote at a meeting called for that purpose, sold the railroad bonds and used the proceeds thereof. The railroad bonds having depreciated in value, the town filed a bill, alleging certain irregularities in the issuing of its own bonds, a part of which had in the meantime passed into the hands of defendant Park, a *bona fide* holder for value, and praying that they be delivered up to be cancelled. *Held,* that the town was estopped to deny the validity of its bonds.

The bill also alleged that Park and his associates, in virtue of their directorship of said railroad, and their agency in transactions whereby that railroad was consolidated with others, and large profits thereby made by Park and his associates, sustained the positions of trustees to the orator and other stockholders in said railroad. But as the bill was not brought in behalf of such other *cestuis que trust,* nor against all the alleged trustees, it was *held* that the court could not adjust equities between all those parties.

APPEAL from the Court of Chancery.

The amended bill alleged that on January 16, 1867, and for a long time prior thereto, the defendant Trenor W. Park had been and was the principal owner of what was then known as the Bennington & Rutland Railroad, which extended from Bennington to Rutland, and had for a long time been operated by the Troy & Boston Railroad Company, under a lease from Shepherd Knapp and George Briggs, trustees thereof, in connection with said Troy & Boston Railroad, so as to form a continuous line from Troy to Rutland ; that on January 16, said Park, having control of said Bennington & Rutland Railroad, procured a suit to be brought by said Knapp and Briggs against the Troy & Boston Railroad Company, and all its property in Vermont to be attached therein, and thereby severed all connections between said railroads ; that the orator was informed and believed that said suit was fictitious and brought in pursuance of a scheme on the part of said Park to bond the orator and other towns in Vermont, to enable him to build a railroad in New York to connect with said Bennington & Rutland Railroad as thereinafter stated ; that in March, 1867, said Park, by what the orator was informed and

believed were improper inducements, and in pursuance of said scheme, procured the then Governor of Vermont to call a special session of the Legislature, of which said Park was a member, at which session said Park by undue influence procured an act to be passed entitled, " An act to enable the towns therein mentioned to aid in obtaining necessary railroad communications," which, so far as material, was as follows:

SEC. 1. The towns of Bennington * * * * are hereby authorized and empowered to subscribe for, purchase, or acquire, upon the conditions in this act specified, the bonds of the Lebanon Springs Railroad Company, a corporation existing in the State of New York, or the bonds or stock of any other railroad company now or hereafter organized, whose road shall connect with the Bennington & Rutland Railroad, or with any road connecting therewith, in such manner and direction as to afford to said Bennington & Rutland road, communication by railroad with New York, Albany, or Boston ; and to make any contract incident to the subscription for, or purchase of, such bonds or stock. * * *

SEC. 2. No such subscription, purchase, or contract shall be made by either of the towns aforesaid, unless the assent in writing thereto of a majority of the tax-payers, both in number and amount of tax in such town, shall be obtained before the first day of January, 1868, which assent shall be signed and acknowledged before a justice of the peace * * * by each person so assenting, and the amount of the list of such person shall be set opposite his name. And said assent shall state substantially the contract, subscription, or purchase to be made, and the conditions on which the same is to be made.

SEC. 3. In every such instrument of assent shall be named three persons, who shall be resident citizens and tax-payers of the town wherein such assent has effect, as commissioners to make and execute on behalf of such town, the subscription, purchase, or contract therein mentioned, and when such instrument shall have been signed and acknowledged by the majority herein required, such persons therein named shall be commissioners for that purpose. And any contract, subscription, or purchase, by them made and subscribed in writing, in the name and behalf of such town, in pursuance of the terms of said assent, and not inconsistent therewith, nor with the provisions of this act, shall be valid and binding upon such town.

SEC. 4. Any of the said towns are hereby authorized and empowered to make and issue their negotiable bonds or notes * * * for the purpose of making any purchase, or fulfilling any subscription or contract authorized, by this act, or of raising money so to do, which said bonds or notes shall be signed by the selectmen, and countersigned by

the treasurer of the town issuing the same, * * * and registered in the town clerk's office of such town.

\* \* \* \* \* \* \* \* \* \* \* \*

SEC. 6. When any instrument of assent herein provided for shall have been signed and acknowledged by the majority and in the manner herein·required, the commissioners named in such assent shall append thereto a certificate by them subscribed and sworn to, stating that such assent has been signed and acknowledged by such majority as required by this act. And shall cause such instrument of assent and certificate to be filed in the town clerk's office, * * * and cause the same to be there recorded. And a copy of such assent and certificate, certified by such town clerk, shall be recorded in the county clerk's office of the county where such town is situated. * * * Such certificate so executed and recorded, shall be conclusive evidence of the facts stated, and by this act authorized to be stated therein. * * * * *

\* \* \* \* \* \* \* \* \* \* \* \* \*

The bill further alleged that said act was unconstitutional and void; that after said act was approved, said Park by falsely and fraudulently representing in public and private meetings of the citizens of said Bennington, that the orator by giving such assent and issuing said bonds, should incur no liability, but merely loan its credit, and by other fraudulent devices, procured a pretended assent to the issue of said bonds, but that, as the orator was informed and believed, no such assent as was required by said act was ever obtained, but that on the contrary the names of many tax-payers were affixed to said instrument of assent without their knowledge or consent, and that no majority of the tax-payers ever did sign and acknowledge said instrument; that said Park, well knowing the same, procured the orator's selectmen and treasurer to make and issue to him its bonds, with seven per cent. semi-annual interest coupons attached, to the amount of $125,000, to aid in the construction, and in exchange for a like amount of the bonds, of said Lebanon Springs Railroad, which said bonds said Park falsely and fraudulently represented to be good and of equal value with those issued by the orator, whereas he then well knew that they were of little value; that said Park had sold a part of the bonds and coupons so issued, and received a large sum of money therefor, but that he always had been and still was the owner of a large part thereof, which, to avoid the orator's equitable defences thereto, he threatened to sell; that on August

5, 1874, as the orator was informed and believed, said Park, being such owner, procured defendant Henry F. Lothrop to bring a suit against the orator for $27,562.50, the whole amount of the coupons then due and unpaid ; that although said Lothrop then had said coupons in his possession, he received them with knowledge of the orator's equities therein, and was a nominal party to said suit ; that after several continuances of said suit, and after said Lothrop, in answer to the prayer of the original bill, was enjoined from its further prosecution, said Lothrop entered a non-suit therein ; that for several years after said exchange of bonds, said Park, to conceal the fraud in the bill complained of, and to prevent proceedings by the orator to annul said bonds, surrendered said coupons from time to time as they fell due, in exchange for coupons to a like amount of the Lebanon Springs Railroad bonds ; that in 1869, said Park, being principal owner and manager of said Lebanon Springs Railroad, which was a road wholly without the State of Vermont, extending from Chatham Four Corners in the State of New York to the Vermont line, and operated in connection with the Bennington & Rutland Railroad, sold a large part of the capital stock of the latter road to William B. Duncan ; that early in 1870, said Park and Duncan, being owners as aforesaid, and the capital stock of the Bennington & Rutland Railroad Company being $500,000, and that of the Lebanon Springs Railroad Company $2,000,000, and each road being mortgaged to the Union Trust Company of New York to the amount of its capital stock, procured said railroads to be consolidated under the name of the Harlem Extension Railroad Company, and upon an agreement by which both the capital stock and the bonded debt of the new company should be increased to $4,000.000, for which increase of indebtedness there was no consideration ; that in 1872, said Park and Duncan, still owners, managers, &c., procured the mortgages on the Lebanon Springs and the Harlem Extension Railroads to be foreclosed, and said roads to be sold thereon ; that said Duncan, then President of the company of the latter road, purchased all that part of the road that was in New York, through one J. C. Hull, for $100,000, giving his check therefor, which was never paid, and

said Park, then a director in said company, purchased that part of the road that was in Vermont, through Charles G. Lincoln, for $50,000, for which Lincoln gave a check that was never paid; that immediately after said sales, said Park and Duncan procured said Hull and Lincoln to execute to them, without consideration, a mortgage on the entire road for $5,000,000, which they claimed to hold as a lien for their benefit; that prior to said sales said Park and Duncan had procured said Harlem Extension Railroad Company to be consolidated with another railroad company, whose road extended from the Harlem Extension Railroad's southern terminus to New York city, under the name of the New York, Boston & Montreal Railway Company, upon an agreement that the latter company should execute a first mortgage on the entire road to secure its consolidated first mortgage bonds for the sum of $12,250,000, and a second mortgage to secure its consolidated second mortgage bonds for the sum of $12,750,000, and procured $2,903,000 of the first-named and $3,087,000 of the second-named bonds to be set apart for the benefit of the Harlem Extension Railroad; that immediately after the execution of the mortgage for $5,000,000, as aforesaid, said Park and Duncan procured said Hull and Lincoln to convey the roads they had purchased, to the New York, Boston & Montreal Railway Company, whereupon said last-named company executed said first and second mortgages pursuant to agreement; that since said conveyance of the railroad of the Harlem Extension Railroad Company to the New York, Boston & Montreal Railway Company, the latter company had sold $6,250,000 of its said first mortgage bonds, and paid to said Park and Duncan more than $1,000,000 of that part of the proceeds thereof to which said Harlem Extension Railroad Company was entitled, which was paid to them to apply on said $5,000,000 mortgage, and which they claimed to hold for their own purposes; that by said acts said Park and Duncan purposed to and did render said Lebanon Springs Railroad bonds worthless, and to thereby destroy and appropriate to themselves the orator's security for its own bonds issued as aforesaid, and confederating with said Lothrop, Hull and Lincoln and divers other persons, had neglected and refused to surrender its said bonds and coupons which the

orator alleged to be void, to be cancelled, and to account for money by them received and held in trust for the orator.

The bill, after charging and interrogating in regard to the matters alleged, *prayed* that said Lothrop, Park, Duncan, Lincoln and Hull, might be decreed to surrender to the orator all its said bonds and coupons that they or any of them had or controlled, and to account for all such as they had sold, and for the orator's share of all money they had received, or were entitled to receive from the sale of any of said railroads, or on mortgages of the New York, Boston & Montreal Railway Company, or from the bonds thereby secured ; for an injunction against the further sale of said bonds ; and for further relief.

The answer of defendant Lothrop admitted the bringing of said suit in his name, and that he was a mere nominal party thereto, but denied that he permitted the same to be brought for the purpose of depriving the orator of any just defence to said coupons, and that he ever claimed to be the owner thereof; and denied that he knew they were tainted with fraud, and all other material allegations of the bill.

The answer of defendant Park admitted the bringing of a suit against the Troy & Boston Railroad Company as alleged, but denied that he procured the connection of the Bennington & Rutland Railroad with said Troy & Boston Railroad to be broken ; admitted the convening of the Legislature and passage of said act, as alleged, but denied that there were any improper or fraudulent inducements thereto ; alleged that all proceedings in attaining the assent of taxpayers to the issue of the orator's said bonds, in certifying and recording the same, and in making the subscription in pursuance thereof, were in all respects in conformity with the provisions of said act, and legal and valid ; that said bonds to the amount alleged, were duly issued, and payable to the Lebanon Springs Railroad Company,—said Park taking them as the agent of said company, and making no representations of any kind to the orator's selectmen nor to its treasurer,—and passed by said company for value and in good faith to various parties, of whom the defendant Park was one, said Park having nearly all of them for the building of said company's road, but afterwards dis-

posing of a great part of them to various persons; denied all fraud in the obtaining of said assent or in any of said proceedings; denied that said Lebanon Springs Railroad bonds were worthless, but alleged that they were of great value; denied that defendant Park owned all of the orator's bonds, but admitted that he owned a part purchased in good faith for full value; alleged that said act was constitutional and valid, and that said bonds constituted a legal claim against the orator, to which there was no defence either in law or in equity, and that the orator was liable thereon, not only by reason of their execution and issue, but by reason of subsequent recognition thereof, by various votes and acts in town meeting, and long acquiescence therein on the part of the orator, whereby the orator was estopped to set up any defense thereto; admitted the bringing of the suit by said Lothrop as alleged, but denied that it was brought by his assent or procurement; admitted the consolidation of the Lebanon Springs and the Bennington & Rutland Railroad Companies under the name of the Harlem Extension Railroad Company, but alleged that it was done in good faith, fairly and legally, and with the orator's knowledge and consent, and that it enhanced the value of the Lebanon Springs Railroad bonds; admitted the subsequent foreclosure of mortgages on the Lebanon Springs and the Bennington & Rutland Railroads as alleged, and the alleged purchase of said roads upon foreclosure sales, but alleged that said sales were openly, fairly, and legally made; admitted the consolidation of companies of said last-mentioned roads with other companies under the name of the New York, Boston & Montreal Railway Company; admitted the alleged mortgaging of said roads to said Park and Duncan, but alleged that it was executed for that part of the debts of the Harlem Extension Railroad Company that the New York, Boston & Montreal Railway Company assumed to pay, and to preserve a lien therefor; admitted the conveyance of said roads to said last-mentioned company, and the subsequent execution by said company of a mortgage, and the issue of its bonds thereby secured, for the sum of $12,250,000; and admitted the sale of a considerable portion of said bonds, and the receipt by said Duncan and Park of a part of the proceeds thereof. The answer further alleged

24

that in all said proceedings said Park acted in good faith for the advancement of the interests of himself and his associates in the common property, and with no expectation of private advantage, and with the knowledge and consent of all parties, including the orator ; that said Park denied that he was in any way personally responsible for said consolidation proceedings, and that he or said Duncan had appropriated any of the orator's security or impaired it ; and that the matters in the bill alleged relative to said consolidation transactions, if true, did not entitle the orator to the relief sought.

The defendant Lincoln, so far as the matters alleged related to him, adopted the answer of said Park.

The answer of defendant Park was traversed and testimony taken. The material facts appear from the opinion of the court. At the hearing the Chancellor dismissed the bill with costs. Appeal by the orator.

A. B. Gardner, C. N. Davenport, T. Sibley, and J. B. Meacham, for the orator.

The act is unconstitutional, because the railroad aided was without the state, and the bonds not used for a public purpose. Whiting v. Railroad Co., 25 Wis. 186 ; West River Bridge Co. v. Dix, 6 How. 546, per WOODBURY, J. ; Bukman v. Saratoga Railroad Co., 3 Paige, 75, per WALWORTH, Ch. ; Mayor of Wetumpka v. Newton, 23 Ala. 660 ; Concord v. Bascawen, 17 N. H. 465 ; Riley v. Rochester, 9 N. Y. 64 ; Wells v. Weston, 22 Mo. 385 ; Sharpless v. Philadelphia, 21 Penn. 147 ; Allen v. Jay, 60 Me. 124 ; Lowell v. Boston, 111 Mass. 454 ; Loan Association v. Topeka, 20 Wall. 655 ; Dillon Munic. Corp. ss. 104, 105, 587 ; Cooley Const. Lim. 487. What is a public purpose, is a question for the courts. Sedgw. Const. Law, 443 ; Williams v. School District, 33 Vt. 271 ; Tyler v. Beecher, 44 Vt. 648 ; Weismir v. Douglass, 64 N. Y. 91 ; Loan Association v. Topeka, 20 Wall. 655 ; 2 Redf. Railw. 398. It is also unconstitutional for that it takes from the voters the right to deliberate and decide in the matter, in town meeting assembled. Gen. Sts. c. 15, s. 95 ; Atkins v. Randolph, 31 Vt. 226 ; Poultney v. Wells, 1 Aik. 180 ;

*Montpelier* v. *East Montpelier*, 29 Vt. 12 ; *Mills* v. *Charlton*, 29 Wis. 411 ; *State* v. *Tippan*, 29 Wis. 672.

It follows from the unconstitutionality of the act, that the orator is not estopped. A corporation can ratify only such acts as are not *ultra vires*. *Marsh* v. *Fulton Co.*, 10 Wall. 684 ; *Loan Association* v. *Topeka, supra*. There is a distinction in this respect between the want of power, and irregularities in the exercise of power lawfully conferred. Dillon Munic. Bonds, 53.

The defendant Park was not a *bona fide* holder of the bonds.

The precedent requirements of the statute were not complied with.

*T. W. Park, pro se,* and *E. J Phelps* (with whom was *G. W. Harmon*), for the defendants.

The act is constitutional. *Railroad Co.* v. *County of Otoe*, 16 Wall. 667 ; *East Lincoln* v. *Davenport*, 4 Otto, 802 ; Sedg. Stat. Law, 482 ; *Danville* v. *Railroad Co.*, 43 Vt. 144, 154 ; *Town of Venice* v. *Murdock*, 2 Otto, 494 ; *Miller* v. *Berlin*, 13 Blatchf. 245 ; *Augusta Bank* v. *Augusta*, 49 Me. 507 ; *Society for Savings* v. *New London*, 29 Conn. 174 ; *Lane* v. *Schamp*, 20 N. J. Eq. 82 : *People* v. *Mead*, 36 N. Y. 224.

The orator is estopped to deny the regularity of the issue of its bonds, and the validity of its contract. *Knox* v. *Aspinwall*, 21 How. 539 ; *Moran* v. *Com'rs Miami Co.*, 2 Black. 722 ; *Mercer Co.* v. *Hackett*, 1 Wall. 83 ; *Grand Chute* v. *Winegar*, 15 Wall. 355 ; *Kennicott* v. *Supervisors*, 16 Wall. 464 ; *Coleman* v. *Evans*, 2 Otto, 489 ; *Marcy* v. *Oswego*, 2 Otto, 638 ; *Humboldt* v. *Long*, 2 Otto, 642 ; *Moultrie* v. *Rockingham Bank*, 2 Otto, 631 ; *County of Leavenworth* v. *Barnes*, 4 Otto, 70 ; *Douglas Co.* v. *Bolles*, 4 Otto, 104 ; *Johnson Co.* v. *January*, 4 Otto, 202 ; *Miller* v. *Berlin*, 13 Blatchf. 245 ; *Supervisors* v. *Schenck*, 5 Wall. 772 ; *Pendleton Co.* v. *Amy*, 13 Wall. 298 ; *Danville* v. *Railroad Co.*, 43 Vt. 154 ; *Supervisors of Mercer Co.* v. *Hubbard*, 45 Ill. 139 ; Dillon Munic. Corp. s. 376, *et seq; Keithsburg* v. *Frick*, 34 Ill. 405 ; *Shoemaker* v. *Goshen*, 14 Ohio, N. S. 569 ; *Society for Savings* v. *New London*, 29 Conn. 174 ; *Randolph Co.* v. *Post*, 3 Otto, 514.

The defendant Park is entitled to protection as a *bona fide* holder of the bonds. *Commissioners* v. *Bolles,* 4 Otto, 109; *Mc-Clure* v. *Orford,* 4 Otto, 432.

The requirements of the act were duly complied with.

The opinion of the court was delivered by

POWERS, J. At a special session of the Legislature, held in March, 1867, an act was passed entitled, " An act to enable the towns therein mentioned to aid in obtaining necessary railroad communications."

The first section declares that the town of Bennington and certain other towns in Bennington and Rutland Counties " are hereby authorized and empowered to subscribe for, purchase, or acquire upon the conditions in this act specified, the bonds of the Lebanon Springs Railroad Company, a corporation existing in the State of New York, or the bonds or stock of any other railroad company now or hereafter organized whose road shall connect with the Bennington & Rutland Railroad, or with any road connecting therewith, in such manner and direction as to afford to said Bennington & Rutland road communication by railroad with New York, Albany, or Boston, and to make any contract incident to the subscription for or purchase of such stock or bonds." Sec. 2 provides that no subscription, purchase or contract shall be made, unless the assent in writing thereto, of a majority of the taxpayers, both in number and amount of tax in said towns, shall be obtained before January 1, 1868, and that such assent shall be signed and acknowledged by each person so assenting, before a justice of the peace, and that the amount of his list shall be set opposite each signer's name, and that such assent shall state substantially the contract, subscription or purchase to be made, and the conditions on which the same is made. Sec. 3 provides for the naming of three resident citizens and taxpayers, as commissioners, to make on behalf of the town the contract of subscription, and clothes the commissioners with power to act when the requisite majority of taxpayers have assented, and further provides that the contract of subscription, so made by the commissioners, pursuant to said assent, and not inconsistent with said

Town of Bennington *v.* Park et als.

act, shall be binding upon the town. 'Sec. 4 empowers the towns to issue negotiable bonds for the purpose of fulfilling such con-tract of subscription. Such bonds to be signed by the selectmen, and countersigned by the town treasurer, and registered in the town clerk's office. Sec. 5 regulates the details of the duty of the commissioners in computing the majority required in section 2. Sec. 6 provides for a certificate by the commissioners, that the requisite majority has been obtained, and for the record of the assent and certificate aforesaid, in the offices of the town and the county clerk respectively, and declares that the certificate shall be conclusive evidence of the facts stated in it, and by the act authorized to be stated therein. The remaining sections of the act are not material to the discussion of the case. The act was approved by the governor, March 28th, 1867.

Pursuant to the provisions of this act, the taxpayers of Bennington executed an instrument of assent, which was filed and recorded in the town clerk's office in that town on the 25th day of May, 1867, and shortly thereafter the selectmen and treasurer signed and issued negotiable bonds of the town, to the amount of one hundred and twenty-five thousand dollars, and delivered the same to the Lebanon Springs Railroad Company in payment for an equal amount of its mortgage bonds, and a like equal amount of its capital stock. Other towns, corporations, and individuals in Vermont and New York, made subscriptions in aid of said railroad, and the same was built and commenced running to Bennington in the winter of 1868–9. The defendant Park took the contract and built the road, and received in part payment therefor the town bonds issued to the railroad company.

This bill in equity is brought by the town of Bennington against Park and others, charging, in substance, that the defendant Park, as part of a scheme to bond the town to enable him to build a railroad in New York to connect with the Bennington and Rutland Railroad whereof he was the principal owner, by improper inducements procured the governor of the State to convene the Legislature, and when so convened, by undue influence, procured the passage of the enabling act above set forth ; that the act is unconstitutional and void ; that the assent of the majority of the

taxpayers was never obtained as required by the act; that their assent, so far as obtained, was procured by the false representations of Park; and that the execution of the bonds by the select- men and town treasurer was induced by like representations by him; and lastly, that Park and others effected a consolidation of the Lebanon Springs Railroad with other railroads, and issued a large amount of consolidated mortgage bonds thereon, which he and his confederates sold at great profit to themselves, for which he ought to account to the orator; and prays that the defendant Park be decreed to surrender to the orator all its bonds now held by him; that he account for those sold to other parties; that he account to the orator for its equitable share of the profits made on the sale of the consolidated bonds aforesaid; that he be decreed to pay to the orator so much money as may be necessary to cancel its outstanding bonds issued to the Lebanon Springs Railroad Company; and for general relief.

The defendant Park filed his answer, denying the material allegations of the bill, which answer was traversed, and upon the issue so made by the pleadings, a large mass of evidence has been taken on both sides.

The contention in the case is wholly between the orator and Park; hence the relation of the other defendants to the case need not be stated.

Taking up the allegations in the order in which they are made in the bill, we find that the orator has offered no evidence to support the charge of the exercise of improper influence either in convening the Legislature by the governor, or in procuring the passage of the enabling act; no further attention therefore need be paid to this part of the case.

We are then brought to consider the question of the constitutionality of the act of the Legislature, approved March 28, 1867.

In the consideration of this question, involving the action of a co-ordinate branch of the Government, we are not to be guided by any views of our own as to the expediency or wisdom of the action under review, but are compelled to follow wheresoever well-settled rules of construction may lead us.

Governmental power, under our political system, is divided into

Town of Bennington *v.* Park et als.

executive, legislative, and judicial departments. Each exercises its proper functions in subordination to, and in observance of, the organic law of the state, as expressed in its Constitution. Each within its proper sphere of action is wholly independent of, and not amenable to, the others. So fundamental to the harmonious working of the system was this idea regarded by the fathers of the Commonwealth, that they deemed it worthy to be incorporated into the Constitution, thus : " Sec. 6. The legislative, executive, and judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the other."

It is not to be doubted, however, that the judiciary has the right to declare null any act of the Legislature that is in plain contravention of the organic law. In no other way can the personal and property rights of the citizen be vindicated against illegal or despotic legislation—from no other source can the people secure to themselves a government that shall be a government of laws and not of men.

The theory upon which our political system rests is, that all sovereignty exists originally in the people. They ordained the Federal Government, and delegated to it sovereign power over certain subjects ; they also created state governments, and conferred upon them the residue of sovereign power, so far as they allow it to be exercised at all. A state legislature has all the power necessary for the legislation of a sovereign, independent state, and possesses *all* the law-making power of the people, except so far as it is withheld by the Constitution itself. Plenary power in the legislature is the rule—restricted power the exception.

It is obvious, therefore, in dealing with this question of constitutional power, that the presumptions are all in favor of the validity of the action called in question ; and if we find invalidity at all, it must be upon *clear* and *irrefragable* evidence that the action challenged is in conflict with some express provision of the organic law or its *necessary implications*.

As said by the Supreme Court of Illinois : " The inquiry into the validity of an act of the Legislature is an inquiry whether

the will of the people, as expressed in the law, is or is not in conflict with the will of the people, as expressed in the Constitution ; and unless it be clear that the Legislature has transcended its authority, the courts will not interfere." *Lane* v. *Dorman*, 3 Scam. 238. And by the Supreme Court of Massachusetts : " The acts of the Legislature are to be presumed constitutional, and their operation cannot be impeded unless they manifestly infringe some provision of the Constitution." *Foster* v. *Essex Bank*, 16 Mass. And by the Supreme Court of Connecticut : " It is, however, a well-settled principle of judicial construction, that before an act of the Legislature ought to be declared unconstitutional, its repugnance to the provisions or necessary implications of the Constitution should be manifest and free from all reasonable doubt." *Hartford Bridge Co.* v. *Union Ferry Co.,* 29 Conn. 227. And by the Supreme Court of New Hampshire; " It is an elementary rule that courts must be satisfied beyond a reasonable doubt that the act called in question is unconstitutional." *Perry* v. *City of Keene*, 15 Am. Law Reg. N. S. 397. And by this court, in the language of Chief Justice REDFIELD : " It is, I apprehend, at this day well settled that no court can pronounce any act of the Legislature void for any supposed inequality or injustice in its intention or its operation, provided it be upon a subject-matter fairly within the scope of Legislative authority." *Armington* v. *Barnet*, 15 Vt. 745.

We are to place the act in question and the Constitution side by side, and determine whether the former conflicts with any of the provisions of the latter.

The act, if sustained at all, must be sustained on the ground that it contemplates a valid exercise of the power of taxation. The power to create a public debt can exist only upon the theory that public money may be raised to pay it.

It is agreed on all hands that the money of the citizen can be taken under the guise of taxation only when it is appropriated to · a public purpose. The restriction is clearly and with practical directness expressed in article IX, of our Bill of Rights, as follows : " And previous to any law being made to raise a tax, the

purpose for which it is to be raised ought to appear evident to the Legislature to be of more service to the community than the money would be if not collected."

The public welfare is the ultimate end to be subserved by taxation, and if the building of a railway will promote that, the money of the citizen may be rightfully applied to its aid.

No formula has yet been devised by which to determine what is or is not a public use or purpose within the meaning of the constitutional prohibition; but it is clear that the ultimate advantage of the public as contradistinguished from that of the individual, is its characteristic feature. It is true that a proposed work may be of great utility to both the public and the individual, and still, according to circumstances, be either public or private in its character and quality.

Men set up systems of government in order to subserve certain public ends, and reach advantages that could not otherwise be made available. The state is clothed with the trust of answering these ends. It is not to be limited to the mere duty of governing the people by the exercise of its police power, but it has a higher duty to promote, the educational interests of the people, encourage their industrial pursuits, develop its material resources, and foster its commercial interests, by providing all reasonable facilities demanded by a prudent regard for the growth, development, and general prosperity of a free people; and the state is not to be tied down to any narrow and merely utilitarian policy in promoting the prosperity of its citizens. The problem is not how little, but how much, can be done to elevate the people to the highest plane of material and political prosperity. Schools, colleges, charitable and reformatory institutions, institutions for the development of the arts and sciences, roads, bridges, canals, and countless other internal improvements, have been established and constructed at the public expense by all thrifty states, ancient and modern, and no serious question has been made as to the propriety of such expenditures.

The building of highways is the first object that invites the attention of new settlements; and as these settlements grow in

strength and wants, such ways are necessarily improved, in order to meet the increased use and usefulness of them, and ultimately, as their resources are developed and necessities enlarged, the railway is demanded as the only means that will afford ample facilities for travel, for the transmission of intelligence, for the transportation of their products to, and their necessaries from, markets, for the opening up of their mineral resources, and setting in motion their manufacturing industries. Take away all railroad facilities from Bennington County, and then compare her condition with that of her sister communities, and the argument of public necessity in behalf of railroads would be made out to a demonstration.

But it is said that the aid authorized by the act in question enures to the benefit of a private corporation, and therefore the taxation proposed is for a private purpose. This objection might be raised to almost every species of taxation that is warranted by law ; some private individual or corporation reaps a special benefit ; but if a general public benefit is accomplished, the money appropriated is made of " more service to the community than it would be if not collected."

The right of taxation depends upon the *public character of the object* for which the fund is appropriated, and in no sense upon *that* of the person selected to apply it. *Perry* v. *City of Keene, supra ; Sharpless* v. *Philadelphia,* 21 Penn. St. 166 ; *Alcott* v. *Supervisors,* 16 Wall. 695 ; BENNETT, J., in *Atkins* v. *Randolph,* 31 Vt. 247.

It is agreed by all the authorities that the Legislature may empower railroad corporations to take the lands of the citizen for their use by making just compensation therefor. Such taking of private property in virtue of the sovereign right of eminent domain, is only warrantable on the ground that it is a taking for a *public use.* The distinction between the exercise of the right of eminent domain and the exercise of the right of taxation in favor of railways, drawn by judges in some of the cases, does not, in my judgment, rest upon substantial ground. If private property taken for a railway is taken for a *public use,* it seems to

me that the public character of the enterprise is so far demonstrated as to warrant the exercise of the power of taxation in its behalf.

The right of taxation then is grounded in the fact that railroads are public improvements that promote the general welfare of the public, or some special locality that is a part of the general public. Money raised in their aid by public tax, is therefore raised for a public purpose, and no provision of the Constitution is infringed by such taxation.

But it is said that acts empowering towns to aid in the building of railroads are invalid on the ground that they empower towns to engage in enterprises wholly beyond the scope of the purposes for which they are organized. What are the purposes for which towns are created but to discharge functions of governmental administration which appertain to the state government itself as the general depositary of sovereignty, but which the State for convenience or caprice—at all events by its own volition—has deemed it best to devolve upon its municipal subdivisions? What authority, powers, or duties do towns exercise, possess, or perform in the administration of their ordinary town affairs, such as building and repairing highways, caring for the poor, raising taxes for town purposes, &c., &c., except such as have from time to time been specially delegated to them by the Legislature? What is to prevent a further delegation of power and further devolution of duty to them from the same source, as the wants of the people or the legislative determination of their wants shall demonstrate to be proper and necessary? And shall not such new powers and duties be properly classed among the purposes of their organization as legitimately as those with which they have been previously clothed?

Is it not true that the Legislature can recall any of these powers existing in these municipalities, and resume their exercise at its will and pleasure? May it not assume the duty of providing for the poor of every town in the State, of building and supporting all the highways and assessing all the taxes needed by towns for their ordinary expenses?

If towns are empowered by the Legislature to aid in the con-

struction of railways and levy taxes for that purpose, they are acting in such behalf merely as the agents or appointees of the state, exercising a power of taxation conferred upon them by the state—a power in the very nature of things that could not be delegated by a depositary not having it.

It is not questioned in the cases, and is not questionable, that in the absence of constitutional inhibition, the state itself may build, or aid others in building, railroads and other public works essential to the welfare and prosperity of the state, and tax the people of the whole state for that purpose. Some of our sister states have expended fabulous sums of the public money in the construction of railways and canals.

If such works are so far of public benefit and advantage that the state, in answering the ends for which it exists, provides them as instrumentalities for promoting the prosperity and the development of the resources of its people, why may it not commission any of its municipal subdivisions to aid them, when they are thought to be of special local benefit to them?

There might be some logic in the proposition that, if these works are of a public character, and minister to the wants of the general public, the general public, or the state which represents it, ought to incur the expenses of providing them; but the right of the state to apportion taxation upon localities has never been questioned in cases where such localities enjoyed local advantages beyond those of the general public. If the locality and the general public participate in equal degree in the use of these public works, and the locality reaps a collateral local advantage from their construction, is it inequitable for the state to allow the locality to incur the expense of making the common benefit available?

Upon this principle of apportioning taxation in cases where the public and the local benefit is unequal, counties are taxed for the building of court houses, school districts for the building of school-houses, and in many states, abutting land-owners for the expenses, wholly or in part, of paving and widening streets, and towns for the building of public highways and bridges. From the earliest history of the state, direct taxes have often

Town of Bennington *v.* Park et als.

been imposed by the Legislature upon the lands in gores and sparsely settled localities, for the purpose of building roads therein ; and this, whether the land owners were willing or otherwise.   We have a statute now in force which compels the assessment in every town of an annual tax of twenty-five cents on the dollar of the list for the maintenance of the public highways in the several towns, and the towns have no voice in the matter. Now, in all these cases, the taxation is imposed for public purposes.   The people of the whole state are interested in and may use court houses ; are interested that schools be maintained ; and may freely and alike use the public highways ;  the use of them by the localities in which they are situated, and by the general public, is of the same kind and by the same right, but the local advantage enjoyed by the community where they are located, and their more frequent use of them, warrant the state in compelling them to bear the public burden of their construction.   So with railways, all the people of the state may use them, not in the same manner, with their own vehicles, as they use public highways, but by the same *right*, and for the same general purposes.   Being, then, works designed for public use and serving public needs, why may not the state, if unable or unwilling to provide for their construction, properly allow towns, who may be largely benefited, to assist in their construction if they desire ?   To say that they shall not, because the license empowers them to go outside the purposes of their creation, is to deny that the state may adopt proper measures for promoting the prosperity of its people. Power in the towns to grant aid to railroads exists by legislative grant — power in the legislature, capable of grant, comes from the people, who, by establishing government, have appointed a trustee to administer the trust of making available to them all the prosperity and growth that sovereign states may rightfully aspire to, and thus the people have consented in advance that this power may be exercised.

It follows from what has been said, that it is not essential that the public work proposed should be one that is of uniform advantage to all the people of the state, that determines the question of public purpose, involved in the right of taxation.

But the question as to the right of the Legislature to empower municipalities to aid in the construction of railways which are thought to be of prospective benefit to them, has long since passed from the region of debate to the domain of authority and fixed law.    It is needless to encumber these pages with the long list of cases in almost every State in the Union and in the Federal courts, where the right has over and over again been affirmed. This court, in the case of *Aldis* v. *Hall*, known to the profession as the Swanton case, and heard at the General Term in 1871, concurred in the doctrine as announced in the cases.    We have not overlooked the case of *Atkins* v. *Randolph*, 31 Vt. 226, much relied on by the orator.    In that case it appears that Mann was appointed an agent for the sale of intoxicating liquors for certain purposes within the town of Randolph, by the county commissioner of Orange County, without any consent of the town, and that he conducted that trade in that town without any ratification of his acts by the town, or any knowledge on their part that he was buying his liquors in the name of the town; he paid no avails of his sales into the town treasury, and the town had nothing to do with him or his business.    He bought liquors of the plaintiff in the name of the town, and the suit was brought to charge the town *ex contractu*, on the ground that the law authorizing his appointment made him an agent of the town, and it was held that the law could not have that effect.    The town of Randolph had not been authorized to go into the business of liquor selling by agents or otherwise, as one of the " public purposes of its organization."    Mann was authorized to go into the business, and in its conduct created no privity between the town and his business.    The case decides that the Legislature could not authorize Mann to carry on a private trade at the expense of the town without some agency of the town in making him its agent, or some privity of the town to his business.    BARRETT, J., cites the leading case of *Sharpless* v. *Philadelphia*, *supra*, to illustrate the distinction between this case and the one at bar, thus :  " But here is no contract made by the legislature, *but only an authority given to the respective corporations* to make one between themselves if they see proper."

Taxation imposed to pay Mann's indebtedness would be in aid of a private trade, and in this view the case is like the cases of *Allen* v. *Jay*, 60 Me. 124, *Lowell* v. *Boston*, 111 Mass. 454, and many others, which affirm the self-evident doctrine that taxation cannot be imposed for private purposes. Thus much has been said upon the general question of legislative power in this behalf, not because its existence has been denied by counsel in this case, but in order to trace out the sources of the power and examine the ground upon which it rests. Such review will be found to contribute largely to the solution of the questions raised in the argument.

In this case counsel concede the existence of the general power in the Legislature to authorize municipal aid to railroads, but contend that it can be exercised only by the consent of the towns affected, expressed in open town meetings, and only in favor of railroads within the state. In my judgment, the concession that the power *exists at all* in the Legislature yields the whole ground of debate, and answers both objections made in the case. All agree that towns, as such, have no inherent power whatever to aid in the construction of railways ; that they have only such powers of taxation as are conferred upon them by the Legislature.

Now the power in question must exist *wholly* in the Legislature or wholly in the town ; it is not lodged partly in the one and partly in the other ; nor is it lodged wholly in the one to be exercised conditionally by the consent of the other.

In the early part of this discussion it was sought to be shown that the people have conferred upon the Legislature *all* the sovereign, law-making power which they possessed. The power of taxation is essentially a law-making power, and cannot in reason and upon principle be classified elsewhere. It follows that authority given to towns to aid public works is a *special delegation* of municipal power by the legislature not before enjoyed by them. How, then, can the consent of the town affect the question of legislative power ? How can the town, *having no inherent power at all* in the premises, confer power upon the Legislature, or add vitality to its grant ?

But the act in question was submitted to a vote of the town.

The act provides that before action thereunder is taken, "the assent in writing thereto of a majority of the tax-payers both in number and amount of tax in such town, shall be obtained before January 1st, 1868;" and further provides that each tax-payer so assenting, shall sign and acknowledge his assent before a justice of the peace. Now all this formality in securing the assent of the tax-payer, is only a mode of obtaining his vote in favor of the proposed aid. The Legislature has the undoubted right to prescribe the mode of voting by towns, school districts, and other municipal organizations, and has always exercised the right. It may rightfully provide that the action of the municipality shall be contingent upon a majority vote, a two-thirds vote, or the unanimous vote of the inhabitants; and it may require the majority to include male tax-payers, or female tax-payers, and to include or exclude such persons as its wisdom may determine. It may require a *viva-voce* vote, a ballot, or the written expression of the voter's opinion, to be acknowledged before a public officer, as the best mode of authenticating the public voice. It may require any mode of voting to be exercised in or out of a public meeting, under such regulations and precautions as it may define. The qualifications of voters in town meetings are prescribed by the legislature, and they are quite unlike those of freemen in freemen's meetings. At the time of these proceedings the right to vote in town meetings was limited to male persons of the age of twenty-one years, *whose list shall have been taken* the year preceding his voting, and persons exempt from *taxation* by reason of age. The qualification of voters in villages and school districts was the same. Thus it is seen that the *right to vote* is grounded in the *liability to pay taxes*. In town meetings held under the general law, a bare majority of tax-payers present and voting, though such majority be not one-tenth of the tax-payers in town, is sufficient to determine the action of the town, no matter how important or disastrous the consequences. But under the act in question, greater restrictions and guards are thrown around the property of the tax-payer. The question of assenting to the proposed aid is, with an unimportant exception, *submitted to the identical persons* who could legally act upon the question in a town

Town of Bennington *v*. Park et als.

meeting; and a majority of the whole number of voters in town must be obtained. In addition to this, a majority of the list in amount must be secured, the act proceeding upon the theory that the property likely to be charged by any obligations assumed, should have a controlling voice in determining the action to be taken. In many cases in meetings held under the general law, a majority of the voters represents a very decided minority of the grand list, and in all cases, the substantial tax-payers of the town are quite as apt to be conservative in the matter of appropriating public moneys, as those with merely nominal lists.

It is difficult to see how the Legislature could more effectually guard the rights of voters than it has in the act in question. If it be said that fraud was practiced in procuring the assent of the voters, it may be answered that it might be under any mode of voting that the wisdom of man has yet devised. Ballots in town meetings may be miscounted or uncounted, illegal votes may be cast, voters may be intimidated, cheated, or bought.; but in the hands of honest officials, a vote taken under the provisions of this act is much more likely to photograph the public wish than one taken in town meeting. The opportunities for fraudulent voting are much lessened by the formality required.

But it is said that the commissioners may defraud the town by making a false certificate that the assent has been executed by the requisite majority. If they do, the public grand list of the town, the instrument of assent with the names and list of the signers, both on file in the town clerk's office, afford a certain means of detection. Somebody must determine this question, and we are unable to see how a tribunal named by the tax-payers themselves, with all the formalities specified in the act, would be any more exposed to temptation than one created in any other manner. Again, it is objected that they are made the judges of their own election, and that this conflicts with a well-settled rule of public policy, and is not to be sanctioned. But an inspection of the act will show that their " election " is made by the Legislature. They are appointed by the Legislature, and their appointment is sanctioned by the tax-payers, to determine the question whether a majority of the votes have been given in favor of the

26

proposed action, and if so, to make the contract authorized. As well might it be said that an act of the Legislature was defective that authorized the selectmen to contract for the purchase of a town clock, or a fire engine, or to build a bridge, provided a majority vote of the town be first obtained in favor of the proposal, and that the selectmen should count the votes cast upon the question. Would the selectmen in any practical sense be made judges in their own cause ? This criticism upon the act involves a radical misapprehension of the scope of the rule of policy invoked.

The suggestion made in argument that towns in Vermont, especially Bennington and her sister towns, whose charters antedate the formation of the Constitution, have certain chartered or natural rights which were never surrendered in the delegation of sovereignty to the State government, and which exist as a sort of civil birthright in New England society, among which is the inalienable and invaluable right of deliberating upon and discussing in town meeting all questions affecting town interests,—advances a new theory of political rights never before evolved in the study of constitutional law.

That no such paramount right is vested in towns chartered *by* the State, must be apparent upon the slightest reflection. Such towns were created by the Legislature pursuant to express authority conferred by the Constitution. Every power they exercise in the local administration of their affairs, is expressly delegated to them by legislative enactment. They are made and unmade at the pleasure of the Legislature, and every purpose of their creation and existence is derived therefrom. They are convenient instrumentalities provided by the State for the purpose of administering those local affairs which the State has judged may be more readily and wisely done by them than it could be by the State itself. They hold town meetings, to " discuss and deliberate upon questions affecting town interests," not in virtue of any inherent right, but because the *statute* has provided that they *shall hold* such meetings. The statute creates all the officers of towns, prescribes their duties, and defines their liabilities. Clearly, no rights of these towns are outside the limits of legislative control.

Nor do we think that those towns in existence when the Con-

stitution was formed have any reserved sovereignty peculiar to themselves and not enjoyed by all other towns in the State. Those old towns held town meetings it is true ; but those meetings were quite different in their character and purposes from meetings held by towns for municipal ends. They were meetings generally held for consultation upon measures of policy not affecting towns in their local interests, but concerning the public welfare. They partook largely of the character of "provisional parliaments," convened for the purpose of devising means for the public safety while the settlers were preparing the way for some form of organized government.

The men of those towns were the framers of the Constitution ; in it they created a legislative department and clothed it with all the power necessary for the legislation of a free and sovereign State ; (*sec.* 9, *part second ;*) they also delegated to it the power " to constitute towns, boroughs, cities, and counties ;" and if such new towns were to enjoy less privileges or stand in any different subordination to the State government than the existing towns, it is remarkable that no mention of such difference is made in the Constitution itself. The government thus set up has gone on for a hundred years, upon the theory that all the towns in the State were alike subject to the Constitution, and enjoyed alike such immunities as the Legislature conferred, and no others ; the old and the new towns have been treated by every department of the government as municipal subdivisions of the State, existing at the pleasure of the State, and for purposes of State polity alone ; all owing the same measure of allegiance and clothed with the same measure of duty and protection. This long practical exposition of the scope and spirit of the Constitution has been in strict fulfillment of the purposes of those patriotic men who framed it. Let them speak : " That the inhabitants that at present are, or that may hereafter become, resident, either by procreation or emigration, within said territory, shall be entitled to the same privileges, immunities, and enfranchisements as are allowed ; and on such condition and in the same manner, *as the present inhabitants, in future shall or may enjoy ;* which are, and forever shall be considered to be, such privileges and immunities to the free citi-

zens and denizens as are, or at any time hereafter may be, allowed to any such inhabitants of any of the free and independent States of America : And that such privileges and immunities shall be regulated in a bill of rights, and by a form of government, to be established at the next adjourned session of this convention." The foregoing extract is made from the declaration of the independence of the State, framed by the convention which formed the Constitution, at its session, held in January, 1777, at which session Bennington was represented by a larger number of delegates than any other town, and two of her delegates were upon the committee which drafted this declaration.

The high privilege claimed for the people of towns is, the opportunity of discussing in a town meeting all questions affecting the interests of the town ; and it is said that the act in question infringes upon this right.   If the essence of the privilege is found in the fact and opportunity for discussion, its purpose was fully met in this case.

The record shows that the subject-matter of the proposed action of the town was discussed repeatedly in open meeting in Bennington ; that the friends and opponents of the measure proposed met face to face, and that ample opportunity was given and taken to consider the question in all its aspects and bearings ; that in public meeting, in the public press, and in every possible way, the voters of the town were brought to consider the question of granting the aid proposed.   Surely a formal town meeting could have added no additional safeguards to the town.

But it is a sufficient answer to the objection that the act in question was not submitted to a popular vote, to say, that the Legislature had the exclusive right to determine whether it should be so submitted or not ; that the Legislature, having the constitutional power to authorize the town of Bennington to act at all in the premises, had full power to prescribe the method of such action, as was said in the well-considered case of *Duanesburgh* v. *Jenkins*, 57 N. Y. 177 : " The measure of consent on the part of the town and its tax-payers or electors, was fixable at the will of the Legislature originally ; if not, then the whole power must be denied, for the people of a locality cannot confer power upon the Legislature."

That it is not essential to a valid exercise of legislative authority to towns to aid in the construction of railways, that the question be submitted to a popular vote in open town meeting, has been repeatedly decided by the courts in New York. *Gould* v. *Town of Sterling*, 23 N. Y. 456; *Starin* v. *Genoa*, 23 N. Y. 439; *Matter of the Trustees, &c.*, 31 N. Y. 574; *People* v. *Mitchell*, 35 N. Y. 552; *Duanesburgh* v. *Jenkins*, 57 N. Y. 177. And by the Supreme Court of the United States; *Thompson* v. *Lee County*, 3 Wall. 327; *Campbell* v. *City of Kenosha*, 5 Wall. 203. And to the same effect are Burroughs Taxat. 431, and Pot. Dwar. Sts. 414.

In the case of taking private property under the right of eminent domain, has it ever been questioned that if the legislature delegates this power to a corporation it may rightfully prescribe the conditions and limitations under which and the methods by which the right should be exercised?

It is urged that the act of 1867 is invalid on the ground that it empowers the town of Bennington to aid a railroad lying wholly without the state, and beyond its jurisdiction and control. As we have already seen, the power in the Legislature to authorize municipal aid to railroads, springs from the fact that railroads are public works that benefit the public by the increased facilities which they afford for travel, trade, business, and pleasure, and the development which they promote of the material resources and wealth of the state. Their public use and public usefulness warrant the exercise of the sovereign power of taxation in their aid.

The citizen is taxed for the building of school-houses and the support of schools; but the right to impose taxes for these purposes does not rest at all upon the ground that the state may control the manner of building school-houses, or dictate the management of the schools; but the *work* which schools are established to do, namely, the education of the children of the state, a public duty which the state owes to its people, a public benefit and necessity which the people demand, determines the purpose to be public, which justifies taxation. So in the case of a railway, it is the work which it does for the public, and not the con-

trol that the public may exercise over it, that determines its public character. In many localities it is obvious that the building of a railroad outside the state would better accommodate the wants of the locality than one in the state. In the case of the town of Bennington when this aid was extended to the Lebanon Springs Railroad, it is probable that the building of that road, as matters were then circumstanced, afforded traffic facilities that no route in the state could afford.

The question whether the town should be allowed to aid a foreign road, was addressed to the Legislature, and the right to decide it was vested solely in that branch of the government. So long as the Legislature authorizes taxation for a public purpose, it keeps within the constitutional requirement, and it must be allowed to select the objects it deems deserving its aid.

This doctrine is abundantly fortified by authority in cases where the roads aided were outside the state. In New York; *White* v. *Syra. & Utica R. R.* 14 Barb. 559. In South Carolina; *Copes* v. *City of Charleston*, 10 Rich. 491. In Ohio; *Walker* v. *Cincinnati*, 21 Ohio, 14. In the United States Supreme Court; *Gelpcke* v. *Dubuque*, 1 Wall. 175; *Railroad Co.* v. *County of Otoe*, 16 Wall. 676.

Testing the act of 1867 by the rules governing courts in passing upon the validity of legislative action, we are unable to find any palpable conflict between its provisions and those of the Constitution.

There being then a valid delegation of legislative power to the town of Bennington to act in the premises, it remains to inquire whether there has been any such fatal irregularities in the exercise of the power as will invalidate the bonds held by the defendant. The bill charges that the assent of the tax payers was induced by the fraudulent representations of the defendant, made in public speeches in public meetings called to consider the proposition to aid the Lebanon Springs Railroad.

It is pertinent to remark in this connection, that the great safety of a public discussion in open meeting is illustrated by the claim now made. These meetings were public, and the debates were participated in by both the friends and opponents of the proposed

aid., and lo ! the great fraud practiced upon the voters was con-
summated by means of these discussions.

A fraudulent representation is harmless unless acted upon.
Not only does the proof of the orator in the case fail to support
the charge that the defendant agreed to indemnify the town against
loss by reason of issuing its bonds, but the evidence, taken alto-
gether, is overwhelmingly against it. It is to be noticed that at
the meeting in question were present two of the orator's counsel
in this case ; that both took part in the discussion in opposition to
the contemplated aid ; that both are eminent in their profession ;
and it is not questioned that the defendant was abundantly able to
fulfill any promises of indemnity he might make. Thus a simple
legal remedy was available to the town to protect itself against
hazard, and yet no suggestion was made from any source, to make
the defendant's offer binding upon him. It would be too serious a
reflection upon the intelligence of the voters of Bennington, to
believe that they were induced to act in so important a matter by
such representations, and yet took no steps to protect their liabil-
ity. It is easy to see that whatever may have been said in this
discussion, the voters did not understand that they were invited
to accept the proposals of a contract, and hence the utter barren-
ness of proof that anybody signed the assent, relying upon any
such representations made by the defendant.

The orator offers no proof to support the charge that the select-
men and treasurer were induced by the false representations of
the defendant to issue the bonds after the assent had been re-
corded.

It is insisted by the defendant that he is a *bona fide* holder of the
bonds in his possession, and that errors or irregularities in their
issue or in obtaining the assent to their issue, do not affect his
rights ; that if such irregularities are proved or provable, the
town has waived its right to object now to their binding force as
obligations against the town, by its acquiescence in their issue, by
its recognition of them as subsisting liabilities of the town, and
by its dealings with the consideration received for them.

If the town had no power to issue the bonds in the first in-
stance, it is clear that it would not be bound by the issue on the

ground of acquiescence or ratification. But, when armed with power to act, the town has issued its bonds and exchanged them for the stock and bonds of the railroad company, the contract is consummated, and any action of the town looking to a rescission of the contract must be seasonably made, or the town will be irrevocably bound.

The proposed assembling of the Legislature for the purpose of obtaining legislation enabling the town to grant aid to the Lebanon Springs Railroad, was a matter of public notoriety in Bennington ; the meeting of that body and the passage of the enabling act was a part of the general history of the State at the time ; the provisions of the act were fully discussed in public meetings and in the public press before action was taken under it ; the instrument of assent was publicly circulated for signatures among the tax-payers of the town, and on the 25th day of May, 1867, was filed for record in the town clerk's office, with a certificate attested by the signatures and verified by the oaths of the commissioners that it was duly executed by the requisite majority of the tax-payers ; the document was there afterwards open to the inspection of all persons interested to know its contents or verify its execution ; the bonds were issued by the officers of the town, and registered in the town clerk's office, and delivered to the railroad company in payment for the stock and bonds of that company subscribed for by the town ; for several years afterwards at the annual March meeting of the town, the bonds so issued were treated as a valid outstanding indebtedness of the town, and the bonds of the railroad company counted as available assets of the town, the maturing coupons for interest upon each series of bonds were promptly collected and paid, and, finally, the town, pursuant to the vote of a meeting called for the purpose, sold to one Selover the bonds of the railroad company, and received in cash $12,500 as part of the purchase money, which has gone into the treasury and been used by the town, and the town has brought suit and recovered a judgment therein against Selover for the balance of his indebtedness. The courts, during all this time, were open to the town or any tax-payer complaining of fraud or improper action, but no step was taken by anybody to test or ar-

rest the proceedings while they were *in fieri*, but they were left to drift until the railroad was built and running, and had encountered the financial fate that often overtakes such enterprises.

Surely no case can be conceived to which the doctrine of estoppel could more appropriately apply. The law upon this subject is well settled, and rests upon the broadest principles of equity : " The principle of estoppel, by receiving the stock in exchange for bonds, collecting dividends thereon, making levies to pay the interest on the bonds, and other acts which constitute a ratification of the acts of the agent, is one universally recognized." Burroughs on Taxation, 411. So where towns have acted in aid of a public enterprise by issuing their bonds, making contracts, and levying taxes to pay the bonds or interest thereon for several years, tax-payers who have stood by and knew what was being done, are not entitled to relief against the bonds. Such conduct is a ratification of the acts of their agents. *Tash* v. *Adams*, 10 Cush. 252 ; *Johnson* v. *Stark Co.* 24 Ill. 90 ; *Commonwealth* v. *Pittsburgh*, 43 Penn. St. 391 ; *Moran* v. *Commissioners*, 2 Black. 732 ; *Pendleton* v. *Amy*, 13 Wall. 297 ; Bigel. Estop., *ubique.*

This doctrine is applied very justly in favor of a *bona-fide* holder of the bonds. This class of bonds are made negotiable in form, and in the commercial world have become clothed with the characteristics and immunities of negotiable paper ; they are issued in order to raise money ; they pass from hand to hand like other negotiable securities ; and in the hands of innocent holders are in like manner protected.

A *bona-fide* holder of negotiable securities is one who pays value for them without notice of defences, or one who succeeds to the title of such a holder, though the latter had notice of defences. The rule is, if in the hands of any holder the character of the paper as an available negotiable security is once established, any subsequent purchaser of the paper may stand upon the title and right of such holder. Story Notes, ss. 190, 191 ; Bayley Bills, 500 ; *Comrs.* v. *Clark*, 4 Otto, 286.

It is not questioned that the railroad company held the bonds in the character of *bona-fide* holders ; and it is obvious that the defendant paid a valuable consideration to the company for them.

27

The evidence in the case shows very clearly that Mr. Park had no agency in the execution of the assent or the issue of the bonds, and that he had no notice or knowledge of any misconduct connected therewith.

The act declares that the certificate required of the commissioners shall be conclusive evidence of the facts recited in it. It would greatly clog the free circulation of the securities, and destroy their commercial value, if a purchaser were required to settle questions of fact that the tribunal created for the purpose have already inquired into and adjudicated. A purchaser of these securities who pays value for them without notice of any infirmities attending their issue, or any one standing on his title, may rely upon the certificate as proof of the facts which under the act it properly imports.

The last ground of relief claimed by the orator is, that the defendant Park and his associates, in virtue of their directorship of the Lebanon Springs Railroad and their agency in the subsequent consolidation of this road with others, sustained to the orator and other stockholders of the Lebanon Road the relation of trustees, and that they made large profits therefrom, which equitably belong to the orator. Without stopping to inquire whether this ground of relief, which goes upon the theory that the town bonds are valid obligations of the town, conjoined with the other grounds of relief stated, which wholly ignore their validity, subjects the bill to the criticism of inconsistent pleading — we are all agreed that we have no occasion to give it extended consideration.

The bill is not brought by the orator in behalf of itself and all other *cestuis que trust* against their trustees who have the possession of the trust fund ; and it would be a fruitless as well as unwarrantable work, to attempt an accounting or an adjustment of equities between parties interested who would not be bound by our action. The learned counsel for the orator have not pressed this claim upon our attention with much seeming confidence in its soundness ; and in dismissing its further consideration, it is enough to say, that the scope of the bill is not broad enough to cover the relief sought.

Town of Bennington *v.* Park et als.

The case is full of questions, both of law and fact, some of which have now for the first time been brought to the attention of the court, and their consideration has involved the examination of a large mass of evidence, and the verification of numerous citations of authority. If apology be needed for the somewhat detailed discussion given these questions in the foregoing pages, it is to be found in the necessity created by their importance to a large number of the tax-payers of the state, and the elaborate and exhaustive arguments submitted, that we meet the just expectation of counsel. It is to be remembered that we are called upon to declare what the law *is*, not what it *ought to be ;* and in the discharge of this duty, we can no more overstep the bounds that circumscribe judicial functions, than can the Legislature evade the proper limitations imposed upon its authority.

If the species of legislation under review is fraught with disastrous consequences, it is because the men of the state most noted for wisdom and virtue have misjudged. If such errors of judgment have awakened the consciousness of the people to an appreciation of the consequences that must follow the excessive creation of municipal indebtedness — already of alarming proportions in this country, and constantly being piled up, Ossa upon Pelion, higher and higher, so that the people may at last be tempted by the worst of all evils, *repudiation* — it is never to be forgotten, that the people have retained in their own hands the power to reform such abuses by so amending their organic law as to make them henceforth impossible.

The decree of the Court of Chancery dismissing the orator's bill with costs is affirmed, and the cause remanded to that court.

BARRETT, J., dissented on the constitutional question.