NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2026 VT 17

No. 25-AP-072

| | |
|---|---|
| Michele Morin and Karen Rowell | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Civil Division |
| | |
| City of Burlington | October Term, 2025 |

Samuel Hoar, Jr., J.

Brady C. Toensing of DiGenova & Toensing, LLP, Washington DC, Patrick N. Strawbridge of Consovoy McCarthy PLLC, Boston, Massachusetts, and James F. Hasson[1] of Consovoy McCarthy PLLC, Arlington, Virginia, for Plaintiffs-Appellants.

Erik Ramakrishnan, Assistant City Attorney, Office of City Attorney & Corporation Counsel, Burlington, for Defendant-Appellee City of Burlington.

Charity R. Clark, Attorney General, Ryan Kane, Deputy Solicitor General, and Jonathan Rose, Solicitor General, Montpelier for Defendant-Appellee State of Vermont.

PRESENT: Eaton, Cohen and Waples, JJ., and Zonay and Corbett, Supr. JJ.,
        Specially Assigned

¶ 1. **WAPLES, J.** In this appeal, we consider whether a Burlington charter amendment allowing noncitizens to vote in the City of Burlington's school board and school budget elections violates the voter-eligibility requirements set forth in Chapter II, § 42 of the Vermont Constitution. Plaintiffs sought declaratory and injunctive relief to this effect below and challenge the trial court's

---

[1] Attorney James F. Hasson was on the brief and argued but withdrew prior to issuance of decision.

dismissal of their complaint for failure to state a claim upon which relief can be granted. We extend our discussion in Ferry v. City of Montpelier, 2023 VT 4, 217 Vt. 450, 296 A.3d 749, to clarify the distinction between local and statewide elections. We conclude that plaintiffs' complaint failed to demonstrate that school elections are statewide elections that implicate § 42. See Ferry, 2023 VT 4, ¶ 1 (explaining § 42 "does not apply to local elections"). We affirm the trial court's dismissal.

¶ 2. "Generally, voters in any Vermont election, whether local or statewide, are required to be United States citizens." Id. ¶ 3 (citing citizenship requirement to vote in statewide elections in 17 V.S.A. § 2121 and incorporation of requirement in municipal elections in 17 V.S.A. § 2656); see 1869, No. 50, § 1 (requiring voters at local meetings to be citizens); Art. Amend. 1, 1828 (adding citizenship requirement to Constitution); see also J. Douglas, Sec'y of State of Vt., Records of the Council of Censors of the State of Vermont 332-33 (P. Gillies & G. Sanford eds., 1991) (adopting constitutional amendment requiring citizenship to "exercise the privileges of a freeman"[2]). However, since the founding of Vermont, the Legislature has amended local voter-qualification rules, which developed independently from statewide voter-qualification rules, resulting in distinct pools of eligible voters for local and statewide elections. Ferry, 2023 VT 4, ¶¶ 37, 47 (describing "general historical understanding that local elections are subject to different voter qualifications from statewide elections," creating "distinction between the two types of voters"). For example, historically, local voter-qualification rules required voters to be taxpayers, while statewide voters did not have to be taxpayers. See, e.g., 1915, No. 111, § 1 (qualifying male citizens who have paid taxes, among fulfillment of other criteria, to vote in local elections); 1917, No. 98, § 1 (extending local voter eligibility to women who have paid taxes); 1919, No. 95, § 1

---

[2] In Ferry, we explained that "the word 'freeman' in the Vermont Constitution was used to identify persons with the ability to vote in statewide elections as opposed to voters in municipal elections." 2023 VT 4, ¶ 33.

(requiring local voters to pay poll taxes); Ferry, 2023 VT 4, ¶ 47 (providing that right to vote in local elections was "grounded in liability to pay taxes" while voters in statewide elections did not have to be taxpayers (quotation omitted)). The Legislature subsequently abolished taxpaying requirements. 1966, No. 6 (Spec. Sess.), § 1; see Ferry, 2023 VT 4, ¶ 47 ("Voters in local elections no longer need to be men, own property, or pay poll taxes."). Despite changes over time, local and statewide voter qualifications—as well as local and statewide elections—remained distinct. Ferry, 2023 VT 4, ¶ 47 (maintaining distinction between local and state voters even though some historical differences between local and statewide elections no longer existed, such as paying taxes). The Legislature's recent ratification of localities' extension of the right to vote in local and school elections to resident noncitizens while the Vermont Constitution requires citizenship for statewide voters is part of this long-running development. See Vt. Const. ch. II, § 42.

¶ 3.    We have previously discussed the constitutionality of city charter provisions permitting noncitizen voting. In Ferry v. City of Montpelier, the plaintiffs brought a facial challenge to the City of Montpelier's 2018 noncitizen-voting charter amendment, arguing the amendment violated Chapter II, § 42 of the Vermont Constitution. 2023 VT 4, ¶ 4. Section 42 provides:

> Every person of the full age of eighteen years who is a citizen of the United States, having resided in this State for the period established by the General Assembly and who is of a quiet and peaceable behavior, and will take the following oath or affirmation, shall be entitled to all the privileges of a voter of this state:
>
> You solemnly swear (or affirm) that whenever you give your vote or suffrage, touching any matter that concerns the State of Vermont, you will do it so as in your conscience you shall judge will most conduce to the best good of the same, as established by the Constitution, without fear or favor of any person.

¶ 4.    In Ferry, we held that § 42 applies to statewide elections but does not apply to municipal elections. 2023 VT 4, ¶¶ 9, 36. Because the plaintiffs raised a facial challenge in Ferry, we did not need to define the distinction between statewide and local elections. Id. ¶ 50 (declining

to "define the line between 'local' or 'municipal' and 'statewide' issues"); see id. ¶ 26 (explaining that in facial challenge, litigant argues "no set of circumstances exists under which a statute or regulation could be valid" (quotation omitted)). However, we explained that "whether a specific vote [was] properly municipal or statewide" was a different legal question and provided that a vote municipal in name but statewide in substance was a statewide vote subject to § 42. Id. ¶ 50.

¶ 5. The instant case presents such a question. In 2023, the Legislature approved an amendment to the City of Burlington charter. See 24 V.S.A. App. Ch. 3, § 8a. The amendment allows noncitizens to vote in "a local City of Burlington or Burlington School District election" if they meet enumerated criteria, including being "a legal resident of the United States,"[3] "resid[ing] in the City of Burlington," and "tak[ing] the Voter's Oath." Id. § 8a(a)(1)-(4). The "section does not change a noncitizen's ability to vote in any State or federal election." Id. § 8a(c).

¶ 6. Plaintiffs—two U.S. citizens residing and registered to vote in Burlington—challenged the City's charter amendment as applied to votes on the Burlington School District's annual education budget and votes for members of the Board of School Commissioners, who prepare and adopt that annual budget. Plaintiffs argued that although Burlington's school elections appear local, these school elections are statewide elections because Burlington's education budget is funded through the State Education Fund, such that school election votes "directly impact the State budget" and "the financial interests of Vermonters statewide." Plaintiffs contend that school elections therefore involve issues reserved to statewide voters, barring noncitizen participation under § 42. In the civil division, plaintiffs sought a declaratory judgment that allowing noncitizen voting "on matters involving the City of Burlington's school board and education budget" violated

_____

[3] The statute defines a "legal resident of the United States" as "any noncitizen who resides on a permanent or indefinite basis in compliance with federal immigration laws." 24 V.S.A. App. Ch. 3, § 8a(b).

§ 42. Plaintiffs also sought an injunction to prevent the City from registering noncitizens to vote in Burlington school elections.

¶ 7. The City moved to dismiss plaintiffs' complaint for failure to state a claim upon which relief could be granted under Vermont Rule of Civil Procedure 12(b)(6). It argued that plaintiffs essentially sought to relitigate our decision in Ferry. The City contended school elections are—and have traditionally been—local affairs. The State intervened to defend the constitutionality of the noncitizen-voting charter provision on similar grounds and supported the City's motion.

¶ 8. In February 2025, the trial court granted the City's motion and dismissed the case with prejudice. The court concluded that school elections are local in nature because they address "distinctly local matters," such as "who will be their school board members, and whether to support the budget, and all the distinctly local priorities it represents, as recommended by the board." The court deemed plaintiffs' "exclusive[]" focus on extra-municipal impacts unpersuasive given Burlington voters were not responsible for how the Legislature's school-funding scheme affected them and others in non-Burlington municipalities. The trial court concluded that the City's noncitizen-voting charter amendment did not implicate § 42.

¶ 9. Plaintiffs appealed. On appeal, plaintiffs argue the trial court improperly focused on the label affixed to the election, employing a "circular definition" that failed to distinguish local and statewide elections. They contend such a definition "attempt[s] to reformulate Ferry." Plaintiffs maintain that school elections are statewide elections and urge us to reverse the trial court's dismissal and vacate Burlington's charter amendment as applied to its school elections.

¶ 10. We review de novo the trial court's dismissal of plaintiffs' complaint for failure to state a claim upon which relief can be granted. Baldauf v. Vt. State Treasurer, 2021 VT 29, ¶ 8, 215 Vt. 18, 255 A.3d 731. In doing so, "we assume as true the nonmoving party's factual allegations and accept all reasonable inferences that may be drawn from those facts." Murray v.

5

City of Burlington, 2012 VT 11, ¶ 2, 191 Vt. 597, 44 A.3d 162 (mem.). We "grant a motion to dismiss for failure to state a claim only when it is beyond doubt that there exist no facts or circumstances that would entitle [the plaintiff] to relief." Montague v. Hundred Acre Homestead, LLC, 2019 VT 16, ¶ 10, 209 Vt. 514, 208 A.3d 609 (quotation omitted).

## I. Issue on Appeal

¶ 11. We first clarify the issue on appeal. Plaintiffs frame their issue as: "Does Burlington's charter amendment violate Section 42 of the Vermont Constitution when applied to education elections, because such elections are 'municipal in name, but traditionally the province of "freemen" in substance'?" and cite Ferry, 2023 VT 4, ¶ 50. As discussed above, Ferry held that § 42 applies only to statewide elections and does not govern the voting requirements for local elections. Id. ¶ 9.

¶ 12. Although plaintiffs ultimately seek to exclude noncitizens from voting in Burlington's school elections, the thrust of their argument does not depend on voter eligibility rules. The parties do not dispute that local and statewide voter pools differ or that noncitizens are eligible to participate in local elections but not in statewide elections. See id. ¶ 32 (requiring voters in statewide elections to be citizens under § 42). Rather, the parties dispute whether education elections are properly categorized as local or statewide. In other words, the parties do not dispute that if education elections are properly categorized as statewide elections, § 42 applies and bars noncitizen voting in education elections.

¶ 13. As set forth below, we clarify that local and statewide elections are distinguished by the level of government with proper authority over the election and reject plaintiffs' proposed test relying on extra-municipal effects. We then turn to plaintiffs' as-applied argument that education elections are properly categorized as statewide elections. Because plaintiffs did not argue that school elections involve matters over which state government must retain authority, we

conclude that plaintiffs' complaint fails to demonstrate that Burlington's school elections are statewide elections subject to § 42.

## II. Distinguishing Local and Statewide Elections

¶ 14.    We first elucidate the distinction between local and statewide elections.  In Ferry, we rejected the contention that local elections no longer existed because "[f]undamental aspects regarding municipalities to this day fit with the distinction our case law draws between municipal and statewide elections."  2023 VT 4, ¶ 45.  These aspects were grounded in municipal and state governments' respective powers and electorates.   Id. ¶¶ 45-46 (explaining municipalities are created by Legislature and possess powers "expressly delegated to them" (quotation omitted)).  In maintaining the distinction between local and statewide elections, we repeatedly stressed the "difference between municipal and state government."  Id. ¶ 49.  In the same vein, we held that "when an individual gives their vote 'touching any matter that concerns the State of Vermont,' " they give their vote on "matters concerning state government as opposed to local government." Id. ¶ 41.

¶ 15.    Rooting the distinction between local and statewide elections in their respective levels of government makes sense.  Statewide elections provide qualified voters the avenue to exercise their fundamental right to vote to ensure that state government officers, who "are [the people's] trustees and servants," remain "at all times, in a legal way, accountable to them."  Vt. Const. ch. I, art. 6 (providing that all power is "originally inherent in and co[n]sequently derived from the people"); see Temple v. Mead, 4 Vt. 535, 539-40 (1832) (explaining Constitution "was intended to present a frame of government and a mode of election").  Likewise, voters in local elections hold local governments accountable.  See Ferry, 2023 VT 4, ¶ 46 (explaining municipal officers are "accountable to their local electorate and not the votes of the freemen of the State at large" (quotation omitted)).  From this discussion, we understand that statewide elections involve matters for which state government may be held accountable—namely, matters over which state

7

government has authority. Likewise, local elections involve matters under local government authority.

¶ 16. The Vermont Constitution and the Legislature have established some elections as plainly statewide, including elections of certain constitutional officers and of all national, statewide, and county officials. See, e.g., Vt. Const. ch. II, §§ 44, 47, 48 (specifying manner of election of constitutional officers, including members of General Assembly, Governor, Lieutenant Governor, Treasurer, and Secretary of State); 17 V.S.A. § 2471(a)(1) (listing candidates on consolidated general election ballot). The Legislature has also provided that any votes on "[a]ny statewide public question" are reserved for the statewide voter pool. 17 V.S.A. § 2471(a)(1); see, e.g., 1912, No. 254, § 5 (reserving votes on constitutional amendments to statewide voters); 1915, No. 4, §§ 31-35 (calling for statewide referendum on establishment of statewide system for primary elections). We clarify that a "statewide public question" is one over which state government has authority and may be held accountable by and to state voters.

¶ 17. How do we determine what level of government has authority—and thus may be held accountable—over a given matter? Ferry again provides guidance. In Ferry, we explained that "[i]t is fundamentally different to act as a statewide officer compared to a municipal officer in terms of powers and accountability." 2023 VT 4, ¶ 46. This is due to "the Constitution's treatment of municipalities in the scheme of statewide governance." Id. Specifically, state government receives its plenary powers from the Constitution and creates Vermont municipalities pursuant to authority from the Constitution. Id. ¶ 45; see Rowell v. Horton, 58 Vt. 1, 6, 3 A. 906, 907 (1886) (explaining towns, unlike state government, "derive their powers, not from constitutional provisions, but from legislative enactments"). The State then "expressly delegate[s]" certain powers to municipalities, which have "no rights . . . outside the limits of legislative control." Ferry, 2023 VT 4, ¶ 45 (quotation omitted). Accordingly, state government is vested with authority over—and may be held accountable for—all matters other than those it has statutorily

8

granted to Vermont municipalities and "those powers necessarily or fairly implied in the powers expressly granted." Daims v. Town of Brattleboro, 2016 VT 55, ¶ 10, 202 Vt. 276, 148 A.3d 185 (quotation omitted); see Town of Bennington v. Park, 50 Vt. 178, 191, 202 (1877) (contrasting state legislature, which "possesses all the law-making power of the people, except so far as it is withheld by the Constitution itself," with municipal government, which has "no such paramount right"); City of Montpelier v. Barnett, 2012 VT 32, ¶ 20, 191 Vt. 441, 49 A.3d 120 (describing Dillon's Rule).

¶ 18.    However, the Legislature's ability to delegate authority to municipalities is not limitless. Ferry, 2023 VT 4, ¶ 46.  For example, " '[i]n this State as elsewhere it is a doctrine well established and frequently reiterated by the courts that the functions of the Legislature which are purely and strictly legislative cannot be delegated but must be exercised by it alone.' " Id. (quoting Stowe Citizens for Responsible Gov't v. State, 169 Vt. 559, 560, 730 A.2d 573, 575 (1999) (mem.)).  The Legislature may vest municipalities with "certain powers of legislation as to matters purely of local concern" and "the authority or discretion merely to execute, rather than make, the laws."  Stowe Citizens, 169 Vt. at 560-61, 730 A.2d at 575-76 (quotation omitted).  Any "delegation of authority" must not be "so vague and uncertain that, in exercising its discretion, the municipality must, in effect, make the law." Id. at 561, 730 A.2d at 576.

¶ 19.    From this dual-level governance scheme, we derive two principles to distinguish local and statewide elections.  First, local elections may only involve questions that have been delegated to localities such that local governments have authority over them.  Second, given the limitations on the State's ability to delegate, any delegation of authority to municipalities must be lawful.

¶ 20.    Consistent with these principles, we distinguish local and statewide elections as follows: when the question voted on has been (1) delegated to the locality, and (2) such delegation is lawful, the election is properly a local election.  On the other hand, when the question either

9

(1) has not been delegated or (2) cannot lawfully be delegated to local governments, the election is properly a statewide election.

¶ 21. This analysis is consistent with precedent. First, although <u>Ferry</u> did not define the line between local and statewide elections, 2023 VT 4, ¶ 50, <u>Ferry</u> instructed that the distinction between them "is categorical." <u>Id</u>. ¶ 36. Elections manifest the categorical "difference between municipal government and state government" based on "the power [municipal government] wields." <u>Id</u>. ¶ 49. Local elections express local government's position as "structurally subordinate to and distinguishable from statewide government." <u>Id</u>. ¶ 44.

¶ 22. Second, this analysis comports with <u>Ferry</u>'s clarification that "[a] vote municipal in name, but traditionally the province of 'freemen' in substance, could not avoid the requirements of § 42." <u>Id</u>. ¶ 50. <u>Ferry</u> allows us to assess whether a specific vote is properly categorized as municipal or statewide. See <u>id</u>. (providing whether specific vote is properly municipal or statewide is "different legal question"). An election on a statewide issue over which state government has proper authority, either because it has not delegated or cannot delegate such authority, is a statewide election regardless of its municipal appearance.

¶ 23. Such was the case in <u>Martin v. Fullam</u>, 90 Vt. 163, 97 A. 442 (1916). There, the Legislature passed two acts—on primary elections, 1915, No. 4, and alcohol sales, 1915, No. 171—both presenting "a question of general public policy" on which "the people of the whole state [were] equally interested." <u>Martin</u>, 90 Vt. at 168, 97 A. at 444. The Legislature distributed ballots to each town and city to collect votes on which of two dates the enactments would take effect; these votes were then returned to the secretary of state. The plaintiff, who was eligible to vote in statewide elections but not in local elections because he had not paid his taxes, was excluded from voting and filed a lawsuit challenging the denial of his right to vote.

¶ 24. The Court determined the election was statewide, and the plaintiff was eligible to vote. The Court assessed "the intention of the Legislature," <u>id</u>., and noted that "[i]t is

significant . . . that no officer of the town meeting has <u>authority</u> to declare the result of the votes so given"; rather, the secretary of state reserved authority "to issue his proclamation certifying the result, not in any town or towns, but in the whole state," <u>id</u>. at 172, 97 A. at 446 (emphasis added). Because the legislative enactment calling for the referendum did not contain "plain and unmistakable language" demonstrating intent to use the local voter pool, every person eligible for statewide elections could vote and exercise their right to hold "[t]he legislators [who] are the representatives of the people" answerable "to the people it represents, in other words to the electorate." <u>Id</u>. In <u>Martin</u>, the State did not delegate authority over the election's questions to the towns, even though the votes were physically gathered by the towns.

¶ 25. Plaintiffs argue that statewide elections are those that affect statewide governance. Plaintiffs rely on a 1913 dictionary definition of "concern," defined as "affect[s] the interest of," which they use to interpret § 42's phrase, "touching any matter that concerns the State of Vermont."

¶ 26. We disagree with plaintiffs' imprecise formulation. Although "our interpretation begins with the plain language" when construing a constitutional provision, <u>State v. Pellerin</u>, 2010 VT 26, ¶ 7, 187 Vt. 482, 996 A.2d 204, we also "examine the whole and every part of a provision, together with others governing the same subject matter, as parts of a system," <u>State v. Lohr</u>, 2020 VT 41, ¶ 7, 212 Vt. 289, 236 A.3d 1277 (quotation omitted) (emphasizing that in constitutional interpretation, "we do not read sentences or phrases in isolation"). See also <u>Chittenden Town Sch. Dist. v. Dep't of Educ.</u>, 169 Vt. 310, 327, 738 A.2d 539, 552 (1999) (warning against "excessive reliance on a plain meaning approach to constitutional interpretation"). "[T]he Constitution sought to provide a framework for statewide government specifically," and therefore, neither expressly differentiates between state and local government nor refers to local government. <u>Ferry</u>, 2023 VT 4, ¶ 44; see <u>id</u>. ¶ 33 ("[T]he framers of the constitution were forming a plan for the general government of the State and did not appear to have had an eye on the internal regulation of lesser

11

corporations like towns." (quotations omitted)); Rowell, 58 Vt. at 5, 3 A. at 907 (clarifying Chapter II "has no reference to the plan and frame of town governments, nor to the qualifications of voters therein"). However, the Constitution allows the State to create "towns, borroughs, cities and counties" and grant powers to them. Vt. Const. ch. II, § 6; see Park, 50 Vt. at 202 ("Every power [towns] exercise in the local administration of their affairs, is expressly delegated to them by legislative enactment.").

¶ 27. Because the State governs everything within its borders, including towns, everything may, in some way, affect or relate to state government. To interpret § 42's phrase "touching any matter that concerns the State of Vermont" so broadly would render meaningless the Legislature's ability to designate certain elections as local elections and delegate authority over those elections to localities. As the Legislature may "delegate[] to municipalities powers concerning essentially state functions," the relevant question is whether the election calls for votes on a statewide matter, not whether the votes broadly connect to a statewide matter. Stowe Citizens, 169 Vt. at 561, 730 A.2d at 576 ("A law [is not] invalid because it delegates to municipalities powers concerning essentially state functions, such as education or taxation."); see Ferry, 2023 VT 4, ¶ 48 (distinguishing local and statewide elections despite "connection between municipal and state governance"). Taking together state government's ability to delegate to local governments and our conclusion that " 'touching any matter that concerns the State of Vermont' refers to matters concerning state government as opposed to local government," Ferry, 2023 VT 4, ¶ 41, elections touch matters concerning the State of Vermont when they involve matters over which state government has authority, either because the State has not delegated or cannot delegate such authority to municipalities.

¶ 28. Plaintiffs highlight the Court's analysis of Martin in another case, Slayton v. Town of Randolph, 108 Vt. 288, 187 A. 383 (1936), to emphasize the purported significance of an election's effect. In Slayton, town residents, who were eligible to vote in statewide elections but

not in local elections because they had not paid their taxes, contested their exclusion from an election on whether the town would permit alcohol sales during the upcoming year. Id. at 289-90, 187 A. at 384. The Court again focused on the language of the legislative enactment calling for votes and held that "it was the manifest purpose of the Legislature to allow the towns in the state to speak on the liquor questions as towns." Slayton, 108 Vt. at 291, 187 A. at 384. Unlike in Martin, the Legislature delegated authority over the question to the towns and "left it to each town in the state to determine for itself whether the liquor law should be effective in it." Id. Accordingly, the Court concluded that the Slayton plaintiffs were properly excluded from this local election. Id.

¶ 29. The Court contrasted the Martin vote, which "was in essence and effect" statewide, with Slayton's local election. Id. at 290, 187 A. at 384. It explained that in Slayton's election, "[n]o general state policy is involved," and "[t]he result in one town has no effect at all on any other town or the state at large." Id. at 290-91, 187 A. at 384. From the latter statement, plaintiffs assert that because "the vote [did] not change the legal obligations of Vermonters anywhere else," "the questions voted on [were] of local importance only."

¶ 30. Plaintiffs' construction skews the Court's reasoning in Slayton. The effect, or lack thereof, on other towns did not determine whether the question was statewide or local, but rather the reverse. That is, because the question voted on in Slayton was local, and one over which local government had proper authority, the election did not affect Vermonters across the state. See Ferry, 2023 VT 4, ¶ 46 ("Despite these connections to statewide government, municipalities generally remain entities that control local affairs."). However, local questions may have statewide effect; as we recognized in Ferry, requiring municipal issues to be "purely local" is "untenable and not grounded in history." Id. ¶ 48. The Legislature may allow local governments to regulate questions with extra-municipal effects to the extent that such allowance is lawful.

13

¶ 31. Plaintiffs also posit that "a voter deciding a statewide issue in Vermont is acting as a 'voter of this state.' " Because the word "decide" can be imprecise, and constitutional and statutory language focus on the issue voted upon, such as votes on a "matter that concerns the State of Vermont," Vt. Const. ch. II, § 42, or on a "statewide public question," 17 V.S.A. § 2471(a)(1), we clarify that a voter acts as a statewide voter if they vote on a statewide issue. To reiterate, in this context, a statewide issue is not determined by its impact on state government; rather, a statewide issue is one under the State's authority.

¶ 32. Having established the appropriate test to distinguish local and statewide elections we now turn to the merits of plaintiffs' as-applied challenge.

### III. As-Applied Challenge

¶ 33. Plaintiffs argue that although Burlington's school board and school budget elections may appear to be local elections, under Vermont's current school-funding mechanisms, they are properly categorized as statewide elections subject to § 42. If plaintiffs successfully demonstrate that school elections are statewide elections such that Burlington's noncitizen-voting charter amendment "is invalid as applied to" Burlington's school elections, we "will grant relief to the parties before [the Court] but will not necessarily invalidate the contested law in its entirety." Ferry, 2023 VT 4, ¶ 43 (quotations omitted). We give no deference to the trial court when "reviewing a constitutional challenge to the application of a statute." Athens Sch. Dist. v. Vt. State Bd. of Educ., 2020 VT 52, ¶ 20, 212 Vt. 455, 237 A.3d 671 (quotation omitted).

¶ 34. As set forth above, in determining whether the City's school elections are local or statewide, we consider whether the election has been delegated to the municipality, and if so, whether such delegation was lawful. Supra, ¶¶ 19-20.

¶ 35.    Here, the Legislature has expressly indicated that school matters are local.  Pursuant to statute, local school districts[4] develop their own programs, including decisions about school budgets, in recognition that "one of the strengths of Vermont's education system lies in its rich diversity and the ability for each local school district to adapt its educational program to local needs and desires."  16 V.S.A. § 1; see also id. § 562(8), (10) (granting local electorates authority over approving proposed budgets and electing school board officers); id. § 511(a) ("[T]he electorate within an incorporated school district shall vote such sums of money as it deems necessary for the support of schools."); id. § 563(11)(A) (delegating authority to elected school board officers over preparing annual proposed budgets); cf. Brock v. Bruce, 58 Vt. 261, 268, 2 A. 598, 606 (1886) (explaining school-district officers "are not regarded as in authority under this State, within the meaning of the Constitution, but rather as in authority under their respective municipalities").  Plaintiffs do not dispute that the Legislature has delegated authority over schools to localities.

¶ 36.    Plaintiffs contend, however, that insofar as "the Legislature has delegated education related votes—a state constitutional responsibility—to municipalities, it has also made those [statewide] votes by placing the responsibility to pay for the results of those votes at the state level."  Plaintiffs raise several arguments that despite legislative intent indicating otherwise, school elections are in fact statewide, which we address below.  We note that, to the extent that plaintiffs argue school elections require votes on matters over which state government must retain authority, such that granting localities authority over school elections unlawfully delegates state authority, this claim is not properly before the Court.  Plaintiffs did not plead a delegation-doctrine claim in their complaint nor properly preserve such a claim for this Court.  Plaintiffs did not establish what matters must remain under state authority; explain how the State's current funding formulas are so

_____

    [4]  The Burlington School District itself is a municipality and a separate corporate entity from the City of Burlington.  Baird v. Town of Berlin, 126 Vt. 348, 352, 231 A.2d 110, 113 (1967).

different from past practices that they now unlawfully delegate authority on those matters; or argue that statutes subjecting school elections to local voter-qualification rules are unconstitutional.

¶ 37.    Instead, plaintiffs rely on other legal theories.  First, they claim our decision in Brigham v. State, 166 Vt. 246, 692 A.2d 384 (1997) (per curiam), demonstrates education funding issues have always been statewide matters.  Next, they contend that even if education was traditionally subject only to local control, legislative reforms since Brigham have transformed school votes into statewide votes.  Specifically, plaintiffs assert that school votes "create a legal obligation for the State to pay for those budgets using State revenue.  Therefore, City voters do decide State taxpayer expenditures, which are quintessentially state policy."

¶ 38.    We agree that Vermont education, including education funding across the state, is of statewide concern, but plaintiffs oversimplify the Brigham Court's analysis and conflate state and local governments' respective purview.   In Brigham, we assessed whether the then-predominant means of financing Vermont public schools "deprive[d] children of an equal educational opportunity in violation of the Vermont Constitution."  Id. at 249, 692 A.2d at 386. At that time, public schools were financed through two principal means: funds municipalities raised through local property taxes and "funds distributed by the state under a complex aid formula."  Id. at 252, 692 A.2d at 387.  However, "the major weakness" of the State's formula was that "it equalize[d] capacity only to a level of a minimally adequate education program."  Id. at 253, 692 A.2d at 388.  This standard left "substantial deficiencies in overall equity" because school districts with greater property wealth could easily spend more to improve their educational offerings.  Id.

¶ 39.    Given the "wide disparities" among Vermont school districts, the Brigham Court concluded that the State's financing system was "constitutionally deficient."  Id. at 255-56, 692 A.2d at 389-90.  The Court explained that the Vermont Constitution's Education Clause made clear the state's "obligation to provide for the education of its youth."  Id. at 258, 692 A.2d at 391;

16

see Vt. Const. ch. II, § 68. However, the Court clarified that while the State could not "abdicate the basic responsibility for education by passing it on to local governments," "[t]he state may delegate to local towns and cities the authority to finance and administer the schools within their borders." Brigham, 166 Vt. at 264, 692 A.2d at 395. That is, the State could "still leave the basic decision-making power with the local districts." Id. at 266, 692 A.2d at 396. The Court acknowledged "the laudable goal of local control" and the consideration that "[i]ndividual school districts may well be in the best position to decide . . . issues of a local nature." Id. at 265-66, 692 A.2d at 396.

¶ 40. Properly understood, Brigham requires the State to retain authority over education across all Vermont school districts but allows the State to delegate authority to localities over their internal school districts' administration. Brigham does not preclude the existence of two levels of responsibility—local and state—over education issues, including education funding. Indeed, when the Court heard Brigham, the State had already been using a "complex aid formula" to finance public schools. Id. at 252, 692 A.2d at 387-88 (describing formula known as Foundation Plan). Even though school elections were funded, in part, by state funds, the Court recognized both local and state levels of authority over delegable and nondelegable education matters, respectively. While we agree with plaintiffs that education is a state obligation, we see no reason to conclude from this bare assertion that school elections are not local.

¶ 41. Plaintiffs' arguments that post-Brigham education elections create a "legal obligation" that the State "must" pay and that school votes "decide . . . state policy" rely on this improper conflation. Because municipalities exist "structurally subordinate to" the State, which answers only to the Constitution, municipalities do not create obligations for the State. Ferry, 2023 VT 4, ¶ 44. The Legislature crafted its post-Brigham formula incorporating school election votes of its own volition, and the Legislature is free to delegate less authority over school elections to localities or to amend state procedures making use of resultant votes if it so desires. Park, 50 Vt.

17

at 195 ("Is it not true that the Legislature can recall any of these powers existing in these municipalities, and resume their exercise at its will and pleasure?").  In the same vein, contrary to plaintiffs' argument, it is not municipal votes that decide statewide expenditures but the State's use of those municipal votes.  Collapsing this distinction disregards the State's independent exercise of its statewide authority in creating a funding formula and making use of school votes.  As mentioned above, plaintiffs did not challenge the lawfulness of the State's formula or explain how the State's formula unlawfully makes school votes questions over which state government must retain authority.

¶ 42.  Finally, plaintiffs highlight the statewide effects of school votes following the State's incorporation of such votes.  They contrast school elections with Slayton's local election because those votes "would not change the legal obligations of Vermonters" at large.  However, whether an election is local or statewide does not depend on its effects but rather on the government with authority over, and held accountable for, the election.  The Slayton Court held that the Legislature had delegated the questions to the towns such that the towns had authority over them. See 108 Vt. at 290-91, 187 A. at 384 (leaving liquor law to towns to regulate).  Unlike in Slayton, plaintiffs in the instant case assert that despite delegation, school elections are nevertheless statewide, presenting a claim that was not before the Slayton Court.

¶ 43.  For these reasons, we reject plaintiffs' arguments.  While we are "particularly wary of dismissing novel claims," like the one before us, on a motion to dismiss for failure to state a claim because "[t]he legal theory of a case should be explored in the light of facts as developed by the evidence," factual development of the complaint's legal claims would not change our conclusion here.  Montague, 2019 VT 16, ¶ 11 (quotation omitted).

¶ 44.  Given plaintiffs' complaint did not present a sufficient basis to allow this Court to evaluate whether statewide school-funding mechanisms make the local-voting provisions of Title 16 an unconstitutional delegation of authority, it does not satisfy the rigorous standard necessary

18

for us to "declare null an[] act of the Legislature." Park, 50 Vt. at 191; see State v. Curley-Egan, 2006 VT 95, ¶ 27, 180 Vt. 305, 910 A.2d 200 ("[W]e presume a statute is constitutional absent clear and irrefragable evidence to the contrary." (quotation omitted)); State Treasurer v. Cross, 9 Vt. 289, 293 (1837) ("The doings of the Legislature, when not liable to constitutional objections, are to be respected by the other branches of the government, and their wisdom or propriety are not to be questioned by a co-ordinate branch."). At this juncture, we do not conclude that school elections are statewide contrary to the Legislature's delegation, and accordingly, we do not conclude that the Burlington charter amendment allowing noncitizens to vote in school elections violates the voter-eligibility requirements in § 42.

¶ 45. If, in a future case, plaintiffs demonstrate that the State's education-funding mechanism makes school votes matters over which the State must retain authority—and therefore, that school elections are statewide elections—then school elections would be statewide for every Vermonter. Every local school budget would require participation from all state voters according to state procedures. In other words, such an outcome would entail more than simply preventing noncitizens from voting in the City's school elections.

¶ 46. For the foregoing reasons, we conclude that plaintiffs' complaint failed to demonstrate that school elections are statewide elections subject to § 42. The trial court properly dismissed plaintiffs' claim as a matter of law.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 47. **ZONAY, Supr. J., Specially Assigned, concurring and dissenting.** The majority concludes that plaintiffs failed to demonstrate that school-board and school-budget

19

elections are statewide elections subject to the voter-eligibility requirements of Chapter II, § 42 of the Vermont Constitution. I concur in part because I agree that a vote to elect members of the Burlington School District's Board of School Commissioners is, as a matter of law, a local election. Plaintiffs' argument that the Burlington City Charter amendment violates § 42 as applied to votes to ratify the District's education budget, however, demands an answer to the question left open in Ferry v. City of Montpelier—how do we distinguish between local and statewide issues where a vote is "municipal in name" but allegedly statewide in character? 2023 VT 4, ¶ 50, 217 Vt. 450, 296 A.3d 749. In my view, the text of our state Constitution supplies a complete answer to that question: § 42 provides that its voter-qualification requirements apply to votes "touching any matter that concerns the State of Vermont." Vt. Const. ch. II, § 42. It is undisputed that under Vermont's current education-funding structure, a vote on the District's annual education budget has statewide effects. That being the case, I would reverse the trial court's dismissal of plaintiffs' claim that the Burlington City Charter amendment violates § 42 as applied to the District's education-budget vote.

¶ 48.   Although Ferry did not reach the constitutional question at the heart of this case, it laid the groundwork for today's analysis in delineating the nature and scope of the unique right protected by § 42. 2023 VT 4, ¶ 18 ("This case presents a uniquely Vermont constitutional question—what is required for a plaintiff to establish standing where the alleged injury is derived from a violation of Chapter II, § 42 of the Vermont Constitution?"). The Court explained that § 42 "defines who is entitled to 'the privileges of a voter in this state' " and thus "creates the lawful voter pool for elections to which its provisions apply." Id. ¶ 20 (quoting Vt. Const. ch. II, § 42). It further held that "a person legally voting within the pool" created by § 42 "has an interest in ensuring that the voter pool in which they are participating is constitutionally sound to preserve the effectiveness of their vote," recognizing that " 'the rights of qualified voters to cast votes

20

effectively . . . are of the most fundamental significance under our constitutional structure.' " Id. ¶¶ 20-21 (quoting Trudell v. State, 2013 VT 18, ¶ 7, 193 Vt. 515, 71 A.3d 1235).

¶ 49. Of course, Ferry also held that § 42 applies only to statewide elections and does not govern the voting requirements for local elections. Id. ¶¶ 9, 36. But because the Ferry plaintiffs raised a facial challenge, the Court repeatedly stressed that it was unnecessary to "define the line between 'local' or 'municipal' and 'statewide' issues in this opinion." Id. ¶¶ 43, 48, 50. To be sure, it rejected the plaintiffs' sweeping contention that there simply "are no more 'local' elections as contemplated in the Vermont Constitution when § 42 was first drafted." Id. ¶ 48. But it was only with reference to that broad facial challenge that Ferry rejected the idea that "some extra-municipal impact, no matter how tenuous, constitutes a statewide issue subject to the requirements in § 42." Id. The Court simultaneously affirmed that its holding did not "preclude[] judicial review of municipal elections" under § 42. Id. ¶ 50. Rather, Ferry explained that "[i]t is a different legal question to determine whether a specific vote is properly municipal or statewide—and one not presented in this case." Id. ¶ 50.

¶ 50. Ferry thus cannot be read to suggest that extra-municipal impacts are irrelevant to answering this question in the context of a specific vote. Indeed, in recognizing the possibility of an as-applied challenge, the Court relied on two Vermont cases that expressly spoke of extra-municipal effects: Martin v. Fullam, 90 Vt. 163, 97 A. 442 (1916), and Slayton v. Town of Randolph, 108 Vt. 288, 187 A. 383 (1936). Ferry, 2023 VT 4, ¶ 50. In Martin, the Court described municipal voters as "those . . . who by law are entitled to vote in town meetings upon matters relating exclusively to the town or city in which the votes are given." 90 Vt. at 168, 97 A. at 444 (emphasis added). In Slayton, the Court was even more explicit, explaining that a vote was not governed by § 42 where "[t]he questions voted on are of local importance, only," thus presenting "to each town a question of purely local policy" upon which "[e]ach town speaks for itself and for no one else" and "[t]he result in one town has no effect at all on any other town or the state at

21

large." 108 Vt. at 291, 187 A. at 384 (emphasis added). Moreover—as the Ferry Court observed—Slayton clarified that Martin stood for the proposition that statewide voters could not be denied the right to participate in an election that, while administered by the municipalities, was " 'in essence and effect' " a statewide vote. Ferry, 2023 VT 4, ¶ 50 (emphasis added) (quoting Slayton, 108 Vt. at 290-91, 187 A. at 384).

¶ 51.    Drawing guidance from Ferry, plaintiffs in this case filed a complaint alleging that the statute allowing noncitizens to vote in local Burlington elections, see 24 V.S.A. App. Ch. 3, § 8a, violates § 42 as applied to the following municipally administered votes: (1) votes on the Burlington School District's annual education budget; and (2) elections for members of the Board of School Commissioners, who are responsible for preparing and adopting that annual budget. This is so, plaintiffs allege, because under Vermont's current statewide education-funding system, the District's education budget—though prepared by the Board and ratified by Burlington voters—is bankrolled by the State Education Fund. Plaintiffs contend that because votes establishing the size of the District's budget determine the allocation of State funds and can impact the statewide tax rate, they necessarily involve issues that affect statewide governance and are therefore reserved to the statewide voting pool under § 42.

¶ 52.    In response, the majority formulates a new test under the Vermont Constitution. It rejects plaintiffs' contention that whether a vote is one "touching any matter that concerns the State of Vermont" is—as both the case law described above and the plain language of § 42 suggest—measured by its impact on Vermonters outside the municipality where the vote is taken. Ante, ¶¶ 25-31. Instead, the majority concludes that so long as the question to be voted on falls within authority the Legislature has lawfully delegated to a municipality, that election is categorically "local" and thus not subject to the voter-qualification requirements of § 42. Ante, ¶¶ 19-20. It then holds that because plaintiffs did not "plead a delegation-doctrine claim in their complaint" or

22

otherwise preserve this unanticipated issue for review, they necessarily cannot prevail on their claim to invoke the entirely separate constitutional protections of § 42. Ante, ¶ 36.

¶ 53. For the reasons detailed below, I cannot join the majority's analysis. I pause to note, however, that I concur in a portion of the result—albeit on different grounds. I agree that a vote to determine the membership of the Burlington School District's Board of School Commissioners is, as a matter of law, a local election under Ferry. The District is a municipal entity separate from the City, and the Board "constitute[s] the legislative branch" of the District. 1 V.S.A. § 135; see id. § 126; Baird v. Town of Berlin, 126 Vt. 348, 352, 231 A.2d 110, 113 (1967). Board members, like all "municipal officers today" remain "accountable to their local electorate and not 'the votes of the freemen of the State at large.' " Ferry, 2023 VT 4, ¶ 46 (quoting Rowell v. Horton, 58 Vt. 1, 5, 3 A. 906, 907 (1886)); see also Woodcock v. Bolster, 35 Vt. 632, 637-39 (1863) (concluding that noncitizen may hold local office). This distinction is categorical: "it is fundamentally different to act as a statewide officer compared to a municipal officer in terms of powers and accountability." Ferry, 2023 VT 4, ¶ 46. Because Ferry thus determined that "Chapter II's requirements for statewide elections and representatives, including those in § 42, do not apply to municipal elections and officers," id., I would conclude that a vote to elect members of the Board is, as a matter of law, categorically local and therefore not subject to § 42.[5]

<hr />

[5] It is true, as plaintiffs point out, that the Board is "responsible for the preparation and adoption of a budget" based on "a detailed estimate of revenues and expenditures" for the ensuing fiscal year. 24 V.S.A. App. Ch. 3, § 168(a)(1). But it is the municipal voters who are ultimately tasked with approving the education-spending portion of the District's budget. Id. § 168(b)(1). If the majority of voters do not approve the budget before the commencement of the fiscal year, the Board must amend the budget to permit education spending for that fiscal year in an amount not to "exceed the education spending last duly approved by the legal voters adjusted by the total dollar amount change in the base education payment for the budget year multiplied by the equalized pupil count for the budget year." Id. § 168(b)(2). Moreover, the Board's budget-related responsibilities represent only a fraction of its members' broad duties in administering the District. Id. §§ 167, 169; 16 V.S.A. §§ 554, 561, 563; see Skiff v. S. Burlington Sch. Dist., 2018 VT 117, ¶ 24, 208 Vt. 564, 201 A.3d 969 (recognizing that powers of school district include, among other things, "determining the educational policies of the school district and taking any action that is required for the sound administration of the school district" (quotation omitted)). Regardless of the Board's

¶ 54. But the second component of plaintiffs' as-applied challenge—their argument that a vote to ratify the District's annual education budget is subject to Vermont Constitution's voter-qualification requirements—does not fall within one of the categories recognized in Ferry. It thus demands an answer to the question left open in that case: how does § 42 "define the line between 'local' or 'municipal' and 'statewide' issues?" Ferry, 2023 VT 4, ¶ 50.

¶ 55. Where, as here, the Court is faced with the weighty task of establishing a new test under the Vermont Constitution, our goal is "to discover and protect the core value that gave life to" the provision at issue and arrive at a result that "give[s] meaning to [its] text in light of contemporary experience." State v. Misch, 2021 VT 10, ¶ 9, 214 Vt. 309, 256 A.3d 519 (per curiam) (quotations omitted) (establishing standard to determine whether law infringes right to bear arms under Chapter I, Article 16 of the Vermont Constitution). The Court has repeatedly affirmed that this work "begins with the plain language" of the constitutional provision at issue. State v. Pellerin, 2010 VT 26, ¶ 7, 187 Vt. 482, 996 A.2d 204; see, e.g., Misch, 2021 VT 10, ¶¶ 11-12 (explaining that goal for Court in that case was to discern "plain meaning" of phrase " 'right to bear arms' " as used in Article 16); Turner v. Shumlin, 2017 VT 2, ¶ 25, 204 Vt. 78, 163 A.3d 1173 (" '[W]e first look to the plain meaning of the [constitutional] language in question' " (quoting State v. Madison, 163 Vt. 360, 368, 658 A.2d 536, 541-42 (1995)). Indeed, State v. Jewett, perhaps this Court's most significant case concerning the interpretation of the Vermont Constitution, echoed the words of Justice Joseph Story: " 'It is obvious, that there can be no security to the people in any constitution of government if they are not to judge of it by the fair meaning of the words of the text.' " 146 Vt. 221, 226, 500 A.2d 233, 237 (1985) (quoting P. Bobbit, Constitutional Fate—Theory of the Constitution 25 (1982) (quoting J. Story, 1 Commentaries on the Constitution of the United States § 407, at 390 n.1 (1st ed. 1833))). Further,

budget-related responsibilities, the vote plaintiffs challenge is still one for the election of municipal officers and thus categorically local under Ferry. 2023 VT 4, ¶ 46.

it is not the role of this Court to pass on the wisdom of the Burlington City Charter amendment or the validity of the concerns that animate it, but merely to determine whether it "passes constitutional muster."[6] Peck v. Douglas, 148 Vt. 128, 133, 530 A.2d 551, 554 (1987) (per curiam).

¶ 56. The majority cites to Chittenden Town School District v. Department of Education, which recognized that "[t]here are sound reasons for avoiding excessive reliance on a plain meaning approach to constitutional interpretation, even if a plain meaning can be found." 169 Vt. 310, 327, 738 A.2d 539, 552 (1999); ante, ¶ 26. I agree: as the Court explained in Ferry, it is often necessary, "[w]hen we look to the plain text of a constitutional provision," to "simultaneously rely 'on historical context to illuminate its meaning.' " 2023 VT 4, ¶ 27 (quoting Misch, 2021 VT 10, ¶ 12). This is not to say, however, that the duty to enforce the Vermont Constitution is somehow satisfied by an analysis unmoored from its plain text. State v. Badger, 141 Vt. 430, 448-49, 450 A.2d 336, 347 (1982) (recognizing this Court's duty to enforce Vermont Constitution as "an independent authority, and Vermont's fundamental law"). Just the opposite, in fact: to my mind, this Court's cases cautioning against overreliance on the plain meaning of constitutional language suggest that the true meaning of an early constitutional provision can only be ascertained when the

---

[6] I note that the City strays from this established analytical framework in arguing that the challenged Burlington charter amendment "had the support not only of a majority of Burlington voters, but also of an overwhelming number of the state's democratically elected delegates to both houses of the General Assembly." As this Court recognized in interpreting Article 11 of the Vermont Constitution to provide greater protection than the Fourth Amendment of the U.S. Constitution, the question for this Court "is not what society is prepared to accept but what the constitution requires." State v. Kirchoff, 156 Vt. 1, 12, 587 A.2d 988, 995-96 (1991) (declining to import, wholesale, federal "reasonable expectation of privacy" test under Article 11, explaining that societal recognition of reasonable expectation of privacy "shifts with political winds and the perceived exigencies of the day, and should not be the measure of individual rights under state and federal constitutions—which, in our view, are to be protected, even from those intrusions that society may be prepared at the moment to tolerate"). This Court's ultimate duty is to enforce the will of the people as expressed through their ratification of the Vermont Constitution, not as indicated by their subsequent votes and the actions of legislators. Cf. Shields v. Gerhart, 163 Vt. 219, 223, 658 A.2d 924, 928 (1995).

plain language is placed in its historical context. See, e.g., Ferry, 2023 VT 4, ¶ 27 (explaining that we must read § 42 in its historical context "because 'we are trying to make the best sense we can of an historical event—someone, or a social group with particular responsibilities, speaking or writing in a particular way on a particular occasion' " (quoting Chittenden Town Sch. Dist., 169 Vt. at 327, 738 A.2d at 552)); cf. Turner, 2017 VT 2, ¶¶ 23, 25 (enforcing plain meaning of term used in provisions of Vermont Constitution that took effect in 1974 and noting that "we are not construing an ancient constitutional provision that would give us pause in applying the plain meaning of the provision's language without considering its historical context").

¶ 57.    As discussed above, § 42 protects the right to vote—a right that "is 'individual and personal in nature.' " Ferry, 2023 VT 4, ¶ 20 (quoting Gill v. Whitford, 585 U.S. 48, 49 (2018)); see Brigham v. State, 166 Vt. 246, 262, 692 A.2d 384, 394 (1997) (per curiam) (rejecting argument that "placement of the Education Clause in Chapter II, setting forth the 'Frame of Government' . . . implies that education was not considered by the framers to be an individual right" and noting that Chapter II of original Vermont Constitution "enumerated any number of individual rights" and was "a perfectly logical place" to provide for right that played "essential role" in "framers' theory of self-government"). The delegation doctrine, on the other hand, stems from "a fundamental principle of the American constitutional system, clearly expressed in our own State Constitution," see Vt. Const. ch. II, § 5, "that the legislative, executive and judicial departments of government are separate from each other, and therefore such functions of the Legislature as are purely and strictly legislative cannot be delegated, but must be exercised by it alone." State v. Auclair, 110 Vt. 147, 162, 4 A.2d 107, 115 (1939).

¶ 58.    Because the delegation analysis is thus shaped by pragmatic concerns, "we apply a relatively forgiving standard to separation-of-power claims." State v. Nelson, 170 Vt. 125, 128, 742 A.2d 1248, 1250 (1999); see Hunter v. State, 2004 VT 108, ¶ 21, 177 Vt. 339, 865 A.2d 381 (recognizing "that we must construe the constitutional command" of separation of powers

26

"consistent with efficient and effective governmental structures that are able to respond to the complex challenges and problems faced by today's state government"). On the other hand, we have never before suggested that the Court should cast a forgiving eye on a claimed violation of a fundamental right. Cf. Brigham, 166 Vt. at 265; 692 A.2d at 396 ("Where a statutory scheme affects fundamental constitutional rights . . . both federal and state decisions have recognized that proper equal protection analysis necessitates a more searching scrutiny."). Given the entirely disparate principles at stake in these two inquiries, I cannot agree that the delegation-doctrine analysis gives meaning to the text of § 42 or protects the individual right recognized in Ferry.[7] See

_____

[7] Moreover, while the majority acknowledges that this Court has repeatedly cautioned that we must be "particularly wary" of dispensing with "novel claims" like the one before us on a motion to dismiss for failure to state a claim because " '[t]he legal theory of a case should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations,' " it proceeds, in my view, to do just that. Montague v. Hundred Acre Homestead, LLC, 2019 VT 16, ¶ 11, 209 Vt. 514, 208 A.3d 609 (quoting Ass'n of Haystack Prop. Owners, Inc. v. Sprague, 145 Vt. 443, 447, 494 A.2d 122, 125 (1985) (collecting cases and authorities)); ante, ¶ 43. Plaintiffs brought the as-applied challenge this Court forecasted in Ferry with careful fidelity to the guidance set forth therein. In response, the majority adopts its novel delegation test—in reality, a requirement that plaintiffs bring an entirely separate constitutional claim in order to vindicate their individual rights under § 42—and then affirms the dismissal of plaintiffs' complaint for failure to state a claim thereunder. That plaintiffs did not expressly raise a separate constitutional claim they could not have anticipated would be necessary to prevail on a challenge under § 42 does not mean it is "beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Colby v. Umbrella, Inc., 2008 VT 20, ¶ 5, 184 Vt. 1, 955 A.2d 1082 (quotation omitted). More fundamentally, however, the procedure followed by the majority results in the resolution of a novel legal question on grounds not anticipated or briefed by the parties. See Jewett, 146 Vt. at 229, 500 A.2d at 238 (identifying this Court's "obligation . . . when state constitutional questions of possible merit have been raised, to address them or order that they be rebriefed when the briefs do not pass muster," and explaining that "[i]f we breach this duty, we fail to live up to our oath to defend our constitution and we help to destroy the federalism that must be so carefully safeguarded by our people"); see also Bloomer v. Gibson, 2006 VT 104, ¶¶ 33, 40, 180 Vt. 397, 912 A.2d 424 (Teachout, J., dissenting) (observing that "opportunity to present arguments on the legal issue upon which a case is to be decided is fundamental to sound legal process, and it is important to public confidence in the judiciary," and dissenting where "[t]he Court has been deprived of the benefit that comes from a full airing of the legal issues, including analysis and arguments presented by advocates, and dialogue that would be helpful in evaluating the wisdom of a proposed rule of law"); Harris v. Town of Waltham, 158 Vt. 477, 485, 613 A.2d 696, 700 (1992) (Allen, C.J., dissenting) ("A principal reason for not considering issues not presented by the parties . . . is the great risk of deciding important issues without hearing reasoned arguments on both sides of a question,

Badger, 141 Vt. at 449, 450 A.2d at 347 ("If our state constitution is to mean anything, it must be enforced where it is the only law capable of providing a final answer to a claim, and a party, such as this defendant, has invoked its protections."). There is some measure of irony here. In adopting this test, the majority itself all but delegates to the Legislature a fundamental task of this Court—the responsibility to determine whether an issue is local or statewide under § 42 of the Vermont Constitution. But the Legislature has "no power to add to, alter, abolish, or infringe any part of [the Vermont] Constitution." Vt. Const. ch. II, § 6. Rather, "[i]t is the province of the court to decide whether Vermont's laws comply with the State Constitution." State v. Shores, 2025 VT 62, ¶ 10, __ Vt. __, __ A.3d __ (quotation omitted). Our decisions, therefore, should be grounded in the text of our state charter.

¶ 59. I thus begin with the language of the provision in question, which leads me down a different path. The voter-qualification requirements of the Vermont Constitution apply where the vote is one "touching any matter that concerns the State of Vermont." Vt. Const. ch. II, § 42. In modern parlance, we would understand this broad phrasing to encompass all votes related to any issue that affects all Vermonters. See Touching, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/touching [https://perma.cc/A9FE-P38F] ("in reference to : concerning"); Any, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/any [https://perma.cc/PP9S-KE4M] (defining "any" to include "one or some indiscriminately of whatever kind," "one, some, or all indiscriminately of whatever quantity," "unmeasured or unlimited in amount, number, or extent," and "appreciably large or extended"); Concern, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/concern [https://perma.cc/7WHT-9667] (defining "concern" to include "to relate to : be about," "to bear on," "to have an influence on : involve" and "to be the business or affair of"). Of course,

---

especially a novel question."), majority decision superseded by statute as recognized in Guntlow v. Bd. of Abatement, Town of Pownal, 2014 VT 118, ¶ 26, 198 Vt. 174, 112 A.3d 732.

we must be careful to read this language in its historical context. But reference to that context does not suggest that a different meaning was intended.

¶ 60. As set forth below, at the time the voter's oath was drafted and throughout the vast majority of our state's history, there was an understanding that the power to approve educational expenditures was local in nature precisely because it was yoked to the local community's obligation to fund those expenditures through the payment of taxes—precisely the obligation this Court fundamentally reformulated in Brigham v. State, 166 Vt. at 249, 692 A.2d at 386. Because a district's education budget is now funded by the State rather than local taxes, I would conclude that a vote to ratify a municipal budget is one "touching [a] matter that concerns the State of Vermont." Vt. Const. ch. II, § 42.

¶ 61. As Ferry recognized, "§ 42 is unique." 2023 VT 4, ¶ 24. It has no parallel in the United States Constitution, id. ¶ 19, or, indeed, any other state charter. Although the voter's oath first appeared in Vermont's 1777 Constitution, which was substantially modeled on the Pennsylvania Constitution of 1776, the oath was not derived from the Pennsylvania charter. P. Gillies, Not Quite a State of Nature: Derivations of Early Vermont Law, 23 Vt. L. Rev. 99, 119, 122 (1998). Rather, the drafters of the Vermont Constitution added both the requirement that freemen take an oath and the oath itself. Id. "The parts Vermont added and subtracted from the Pennsylvania Constitution are what makes Vermont unique among governments throughout history." Id. We should take care to render decisions informed by those choices.

¶ 62. Vermont's 1777 Constitution "provided that '[a] school or schools shall be established in each town, by the legislature, for the convenient instruction of youth, with such salaries to the masters, paid by each town, making proper use of school lands in each town, thereby to enable them to instruct youth at low prices.' " Chittenden Town Sch. Dist., 169 Vt. 310, 335, 738 A.2d 539, 557 (1999) (emphasis added) (quoting Vt. Const. of 1777, ch. II, § XL)); see also Gillies, supra, at 116 (noting that while Pennsylvania's 1776 Constitution "required schools in

29

each county to be supported by the public," the drafters of Vermont's 1777 Constitution chose to "require[] a school in each town paid for by each town"). "By 1782, the Vermont Legislature had implemented the section by providing for and requiring that a uniform system of local school districts be created and that they be financed by taxes on all rateable property of residents of the district, supplemented by a special tax paid by parents whose children attended schools." Chittenden Town Sch. Dist., 169 Vt. at 335, 738 A.2d at 557 (quotation omitted).

¶ 63. In 1839, the Court considered a challenge to a Woodstock school district's vote to raise money for the support of a school by taxing the inhabitants of the district in proportion to the number of students they sent to that school. Brown v. Hoadley, 12 Vt. 472 (1839). The Court observed that in 1797, the Legislature passed an act providing that:

> "the inhabitants of any school district, at a legal meeting, holden for that purpose, shall have power to raise money, by a rate or tax, on the list of the polls and rateable property of the inhabitants of such district, or by subscription, or otherwise, as they shall think most proper, for the purpose of erecting and repairing s[c]hool houses, and supporting schools in such districts."

Id. at 477 (emphasis added). Following the passage of several intervening laws, the Court observed, public schools were "now supported, in a considerable measure, by taxes raised upon the list, the interest of public moneys, and the rents of public lands." Id. at 479. Despite these changes, the Court concluded, "the law, on this particular point, has remained substantially the same. . . . [I]t was the unquestioned practice for the districts to support their respective schools in the manner indicated by their votes." Id. at 478-79 ("[V]otes of . . . school districts, to raise taxes not exceeding a specified sum, are sanctioned by very general practice."). As a result, the Court held that the remaining "balance of moneys" required for the support of schools after accounting for other funding sources "may legally be raised upon the list or scholar, as a majority of the legal voters" within the district "shall prefer." Id. at 479.

¶ 64. The inexorable connection between the right to determine a district's budget and the obligation to fund that same budget—to the extent it exceeds other available funding sources—by raising taxes on the inhabitants of the district is illustrated by numerous decisions throughout this period. See, e.g., Bowen v. King, 34 Vt. 156, 161-62 (1861) (affirming that "[t]he statutes authorizing school districts to raise taxes for building school houses, and supporting schools, require them to be raised by vote in a meeting legally warned" and explaining that the "legal liability upon the district . . . must eventually be satisfied by a tax upon the inhabitants of the district"); Town of Barre v. Sch. Dist. No. 13, 67 Vt. 108, 110-11, 30 A. 807, 807 (1894) (explaining that under act giving municipality "power to divide its territory into such a number of school districts as it might deem necessary to furnish the required instruction," each district "became a corporation," the "sole power and function" of which was "to provide the required instruction to the young of all classes" and "[o]nly for that purpose could it assess taxes"). It was perhaps most succinctly articulated in Greenbanks v. Boutwell, where the Court affirmed the legality of a tax assessed by a school district to fund the construction of a new schoolhouse. 43 Vt. 207, 221 (1870). The Court observed that the "quantity and lay of the land" a schoolhouse should stand on, as well as the "number or kind of rooms, or the particular use to be made of the rooms constituting a school-house" are matters necessarily "left to the judgment and discretion of the district, fairly and honestly exercised, and having reference to the conditions and circumstances of such district." Id. at 217. It held, however, that "[w]hen the district is to get, and actually does get, the thing which it is both its province and its duty to have, it is equally its province and its duty to pay for it." Id. at 216.

¶ 65. This dovetails neatly with the historical understanding of the distinction between local and statewide issues laid out in Ferry. As Ferry observed in analyzing Vermont cases concerning the right to vote in municipal elections around this time: "[s]tated succinctly, 'the right to vote' in local elections was 'grounded in the liability to pay taxes.' " 2023 VT 4, ¶ 47 (quoting

Town of Bennington v. Park, 50 Vt. 178, 200 (1877)). Consistent with this understanding, as recently as 1990, the Court recognized that a statutory procedure pursuant to which a union school district board was required to revise its proposed budget if not initially approved by municipal voters represented "a commonsense balanced approach to resolving competing interests by giving recognition both to the expertise of the board and the taxing concerns of the community." Pominville v. Addison Cent. Supervisory Union, 154 Vt. 299, 302, 575 A.2d 196, 197-98 (1990) (emphasis added).

¶ 66. As plaintiffs recognize, however, this Court's 1997 decision in Brigham v. State marked a sea change in Vermont's school-funding mechanism. Brigham concluded that "the current system for funding public education in Vermont, with its substantial dependence on local property taxes and resultant wide disparities in revenues available to local school districts, deprives children of an equal educational opportunity in violation of the Vermont Constitution." 166 Vt. at 249, 692 A.2d at 386; see also Anderson v. State, 168 Vt. 641, 644, 723 A.2d 1147, 1149 (1998) (mem.) ("In Brigham, we held that students had a right to equal educational opportunity that was violated by the then-existing system allowing districts to assess property taxes locally and spend what they raised." (emphasis added)).

¶ 67. In response to Brigham, the Legislature passed Act 60, the Equal Educational Opportunity Act of 1997. 1997, No. 60, § 18; 16 V.S.A. § 4000(a). "From the broadest perspective," Act 60 represented the Legislature's attempt "to rectify the inequality in educational opportunity in Vermont resulting from the state's heavy reliance on local property taxes to fund schools." Town of Killington v. State, 172 Vt. 182, 191, 776 A.2d 395, 402 (2001). Following Act 60, the Legislature continued to make changes to the education-funding scheme. See 2003, No. 68, § 25; Brigham v. State, 2005 VT 105, ¶ 4, 179 Vt. 525, 889 A.2d 715 (mem.) (noting State's argument that plaintiffs' challenge to Act 60's method of taxation was mooted by passage of Act 68, because Act 68 allegedly "established new methods of funding education that

32

ameliorated the deficiencies that plaintiffs alleged were present in Act 60"). By 2022, this Court explained that "[u]nder the current system, voters within each school district decide the district's budget for each fiscal year," and "[t]he budgets are then funded by the State, which collects property taxes at rates it sets to cover a portion of the cost." Boyd v. State, 2022 VT 12, ¶¶ 5, 32, 216 Vt. 272, 275 A.3d 155 (noting that "the State now funds the entirety of school district budgets").

¶ 68. Today, the approved education budget sent to the State by a municipality is not a "request" which the State can reduce or modify; instead, the State must fund it. Id. As such, when one municipality votes for higher school spending, it votes to increase total statewide education costs. To cover those costs, the State may adjust education tax rates, affecting taxpayers in other municipalities. Local budget decisions in each municipality can therefore have a direct impact on the tax rates in other municipalities across the state. When § 42 was drafted, educational expenditures were a local issue because those expenditures were funded by local coffers. Brigham unquestionably decoupled these two concepts in recognizing that the State cannot "abdicate the basic responsibility for education by passing it on to local governments." 166 Vt. at 264, 692 A.2d at 395.

¶ 69. When the text of § 42 is "understood in its historical context," it compels the conclusion that the authority to approve educational expenditures belonged to municipal voters only because they bore the burden of funding those expenditures—first entirely, and later to the extent that they exceeded other available funds—with their own tax dollars. Misch, 2021 VT 10, ¶ 9. Thus, a school budget vote is, today, one "touching [a] matter that concerns the State of Vermont." Vt. Const. ch. II, § 42. As a result, I would conclude that the Burlington charter amendment violates § 42 as applied to an education-budget vote.

¶ 70. In sum, I am compelled to conclude that the drafters of § 42 meant precisely what they said. Today, a vote to ratify a school district's education budget is one "touching [a] matter

33

that concerns the State of Vermont." Id.  I would therefore hold that members of the voting pool must satisfy the Vermont Constitution's requirements for statewide voters.  Accordingly, I would reverse the decision of the trial court insofar as it determined that school-budget votes are not governed by § 42.  For this reason, I respectfully dissent in part.

_____
Superior Judge, Specially Assigned